UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                :

        - v. -                                  :

MOBILE TELESYSTEMS PJSC,                :

          Defendant.                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: MAR 0 6 2019

INFORMATION

19 Cr. _____ (JPO)

# 19 CRIM 167

The United States charges:

## GENERAL ALLEGATIONS

### Relevant Statutory Background

1.      The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, *et seq.* ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

2.      In relevant part, the FCPA's anti-bribery provisions prohibit any issuer of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*l*, or required to file periodic reports with the United States Securities and Exchange Commission ("SEC") under Section 15(d) of the Securities Exchange Act, 15 U.S.C. § 78o(d) (hereinafter "issuer"), or affiliated persons, from making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of money or anything of value to any person while knowing

JUDGE OETKEN

that all or a portion of such money or thing of value would be offered, given, or promised, directly or indirectly, to a foreign official for the purpose of assisting in obtaining or retaining business for or with, or directing business to, any person.  15 U.S.C. § 78dd-1(a)(3).

3.      The FCPA's accounting provisions require that issuers, among other things, make and keep books, records, and accounts that accurately and fairly reflect the transactions and disposition of the company's assets and prohibit the knowing and willful falsification of an issuer's books, records, or accounts.  15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff(a).

4.      Additionally, the FCPA's accounting provisions require that issuers maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to (A) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (B) maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals, and appropriate action is taken with respect to any differences.  The FCPA also prohibits the knowing and willful failure to implement such a system of internal accounting controls.  15 U.S.C. §§ 78m(b)(5) and 78ff(a).

### Mobile TeleSystems PJSC and Other Relevant Entities and Individuals

5.      The Uzbek Agency for Communications and Information ("UzACI") was an Uzbek governmental entity authorized to regulate operations and formulate state policy regarding communications, information technology, and the use of radio spectrum in Uzbekistan.

As such, UzACI was a "department," "agency," and "instrumentality" of a foreign government, as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-1(f)(1).

6.     During the relevant time period of 2004 through 2012, Mobile TeleSystem PJSC (previously Mobile TeleSystems OJSC, "MTS" or the "Company") was a multinational telecommunications company headquartered and incorporated in Russia.  MTS maintained a class of securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, *see* Title 15, United States Code, Section 78*l*, and was required to file periodic reports with the U.S. Securities and Exchange Commission ("SEC") under Section 15(d) of the Securities Exchange Act, *see* Title 15, United States Code, Section 78o(d).  Accordingly, during the relevant time period, MTS was an "issuer" as that term is used in the FCPA.  MTS had subsidiaries and engaged in joint ventures in various countries in the territory of the former Soviet Union through which it conducted telecommunications business. During the relevant time period, MTS employed between 23,000 and 62,000 people.

7.     In or around 2004, MTS began operating its mobile telecommunications business in Uzbekistan through its subsidiary Uzdunrobita LLC ("Uzdunrobita"), which was headquartered and organized in Uzbekistan.

8.     From in and around 2004 to 2012, MTS held between 74% and 100% of the shares of Uzdunrobita.  MTS acquired its ownership interest in Uzdunrobita, in part, from the purchase of all shares held in Uzdunrobita by an American company ("American Company"), whose identity is known to the United States.  American Company was incorporated and headquartered in the state of Georgia.

3

9.      "Executive 1," an individual whose identity is known to the United States, was a high-ranking executive of MTS who had authority over MTS's foreign subsidiaries from 2007 to 2013.

10.     "Executive 2," an individual whose identity is known to the United States, was a high-ranking executive of Uzdunrobita from 2002 to 2012.  From 2007 to 2012, Executive 2 reported to Executive 1.

11.     "Foreign Official," an individual whose identity is known to the United States, was a relative of a high-ranking Uzbek government official and an Uzbek government official, including Uzbek Deputy Minister of Foreign Affairs for Cultural Issues and Uzbekistan's Ambassador to the United Nations.  Foreign Official had influence over decisions made by UzACI.  Foreign Official was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A).  Executive 2 acted as an "agent" of Foreign Official as that term is used in U.S. law.

12.     "Shell Company A" was a company incorporated in Gibraltar that was beneficially owned by Foreign Official.

13.     "Associate A," an individual whose identity is known to the United States, was Foreign Official's close associate and was the purported sole owner and director of Shell Company A.

14.     "Shell Company B" was a company incorporated in Gibraltar that was beneficially owned by Foreign Official.

15.     "Associate B," an individual whose identity is known to the United States, was Foreign Official's close associate. When Shell Company B was incorporated in 2004, Associate

4

B was approximately 20 years old and was Shell Company B's purported sole owner and director.

16.     KOLORIT DIZAYN INK Limited Liability Company ("KOLORIT") was an advertising company organized under the laws of Uzbekistan. In 2009, Uzdunrobita acquired KOLORIT. As described further below, Foreign Official was an ultimate beneficiary of that transaction.

## Overview of the Corruption Scheme

17.     From 2004 to 2012, MTS, Uzdunrobita, Executive 1, and Executive 2 conspired with others to pay bribes in violation of U.S. law totaling at least $420,825,848 for the benefit of Foreign Official in order to enter and continue to operate in the Uzbek telecommunications market. Executive 1 and certain other management and employees of MTS and affiliated entities and Executive 2 and certain management and employees of Uzdunrobita (hereinafter referred to singularly and collectively as "certain MTS management") understood that they had to regularly make payments to benefit Foreign Official in order to continue to do business in Uzbekistan. During the scheme, conspirators, including Associate A, Associate B, and certain MTS management, used U.S.-based email accounts to communicate with each other and other individuals about the scheme. In addition, MTS and Uzdunrobita made and caused to be made numerous corrupt payments that were routed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York. More specifically:

a.     In or around the summer of 2004, MTS acquired 74% of Uzdunrobita by purchasing a 41% stake from American Company and a 33% stake from Shell Company A. At the time of the acquisition, MTS knew that Shell Company A was beneficially owned by Foreign

Official.  MTS paid Shell Company A for Foreign Official's benefit approximately $100 million for a 33% stake in Uzdunrobita, which represented a price of six times more per share than MTS paid for American Company's 41% stake.  At least a portion of the payment to Shell Company A was made in exchange for Uzdunrobita's ability to operate in Uzbekistan.  Shell Company A retained 26% of Uzdunrobita.  MTS and Shell Company A agreed that either could exercise an option to buy or sell this remaining stake for approximately $37.7 million, plus interest, in three years.

        b.     In or around 2006, at Foreign Official's demand, MTS and Shell Company A agreed to amend the option agreement.  Instead of having a fixed price for the remaining stake in Uzdunrobita, MTS and Shell Company A agreed that the option would be priced at market value.  The amendment was made for the benefit of Foreign Official in exchange for allowing Uzdunrobita to continue to operate in Uzbekistan.  In or around 2007, Shell Company A exercised its option to sell its remaining stake in Uzdunrobita, and MTS paid Shell Company A approximately $250 million, resulting in Foreign Official receiving a much higher purchase price than contemplated under the original option agreement.

        c.     In or around 2008, MTS and Shell Company B entered into an agreement in which MTS agreed to pay $30 million to Shell Company B for Foreign Official's benefit in exchange for Shell Company B's subsidiary repudiating various telecommunications frequencies and the reassignment of those frequencies by UzACI to Uzdunrobita.  MTS paid that amount to Shell Company B for Foreign Official's benefit to obtain the frequencies and to continue to operate in Uzbekistan.

d.      In or around 2009, MTS and Uzdunrobita acquired KOLORIT, an Uzbek
advertising company. Certain MTS management knew that the price paid by MTS for KOLORIT
was inflated to $39.6 million in order to compensate Foreign Official in exchange for
Uzdunrobita continuing to operate in Uzbekistan.

e.      In or around 2012, Uzdunrobita paid approximately $1.1 million in bribes
in violation of U.S. law to entities related to Foreign Official for purported charities or
sponsorships.

18.     The last corrupt payment in violation of U.S. law for the benefit of Foreign
Official was made no later than May 2012.  After that time, MTS and Uzdunrobita did not satisfy
Foreign Official's demands for additional payments.  In retaliation, Foreign Official used her
influence with the Uzbek government to expropriate Uzdunrobita.

### The Corruption Scheme

**A. MTS Corruptly Acquires Uzdunrobita in 2004**

19.     In or around 2004, MTS sought to enter the Uzbek telecommunications market by
acquiring Uzdunrobita.  MTS paid a portion of the purchase price of Uzdunrobita to Shell
Company A for the benefit of Foreign Official.

20.     Certain MTS management knew that Uzdunrobita's majority shareholder at that
time, Shell Company A, was beneficially owned by Foreign Official, who also served as the
Chairman of Uzdunrobita during two 2004 shareholder's meetings.  On or about July 14, 2004,
MTS executed a share purchase agreement with Shell Company A under which MTS agreed to
pay Shell Company A $100 million in exchange for a 33% stake in Uzdunrobita.  On or about
the same day, MTS and Shell Company A executed a Put and Call Option Agreement (the

"Option Agreement") under which MTS had the option to buy, and Shell Company A had the option to sell, Shell Company A's remaining 26% interest in Uzdunrobita for $37.7 million plus interest during the next three years. On or about July 15, 2004, MTS executed a separate share purchase agreement with American Company, under which MTS agreed to pay American Company $21 million for a 41% stake in Uzdunrobita. These agreements falsely stated that the transactions had been "duly and validly authorized by all required action" by MTS, when, in fact, MTS's Board of Directors did not approve the transactions until on or about July 26, 2004.

21.     Pursuant to these agreements, MTS paid Shell Company A approximately six times as much per share of Uzdunrobita as it paid to American Company.   MTS paid the extra amount to Shell Company A in exchange for Uzdunrobita's ability to operate in Uzbekistan.

22.     In or around March 2004, MTS had estimated Uzdunrobita to be valued at approximately $57.8 to $73.9 million. However, four months later in or around July 2004—at the time of MTS's acquisition of Uzdunrobita—MTS documents listed Uzdunrobita's value as between $138.6 and $188.4 million.

23.     On or about July 29, 2004, MTS transferred approximately $100 million to an escrow account for the benefit of Shell Company A in the United Kingdom. On or about August 2, 2004, certain MTS management, including Executive 2, executives from American Company, Foreign Official, and others attended the deal closing ceremony for MTS's acquisition of Uzdunrobita. Foreign Official presided over the meeting as Chairman of Uzdunrobita and signed the meeting minutes. On or about August 9, 2004, the escrow agent for the United Kingdom account transferred approximately $100 million to Shell Company A's bank account in Latvia through correspondent bank accounts at financial institutions in New York, New York.

8

**B. $250 Million Corrupt Payment Through Shell Company A in 2007**

24.     In or around August 2006, at the demand of Foreign Official, certain MTS management and Foreign Official, through Executive 2, negotiated an amendment to the Option Agreement that served to increase the purchase price for Shell Company A's remaining stake in Uzdunrobita. The amendment benefited Foreign Official by eliminating MTS's call option, extending the time period for Shell Company A's put option, and removing the fixed exercise price of $37.7 million plus interest. The amended agreement instead allowed the value of the shares to be determined by an international investment bank selected by the parties. Given that Uzdunrobita's value had increased significantly from 2004, in part due to Foreign Official's influence, certain MTS management understood that the amended option agreement conferred a significant pecuniary benefit for Foreign Official.

25.     On or about August 15, 2006, Associate A signed a resolution allowing Shell Company A to approve the amendment of the Option Agreement. On or about August 17, 2006, MTS and Shell Company A entered into a new agreement that amended the terms of the Option Agreement (the "Amended Option Agreement"). Certain MTS management did not obtain the approval of MTS's Investment Committee or MTS's Board of Directors for the amendment and only informed MTS's Investment Committee after the amendment agreement had been executed.

26.     After the Amended Option Agreement was entered into, but before the option was executed, a new MTS executive learned of the relationship between MTS and Shell Company A. In or around February 2007, the new executive began to raise concerns, including the FCPA risk MTS faced if Shell Company A was, in fact, beneficially owned by Foreign Official.

9

27.     On or about February 7, 2007, the new executive emailed certain MTS management concerning the risk of doing business with Shell Company A because "in the open sources, there are speculations as to the connections of this company and the current [Uzbek] regime." The new executive called for a "confidential investigation of the beneficiary owners" of Shell Company A.

28.     On or about February 12, 2007, the new executive emailed certain members of MTS's management concerning new information the new executive had learned through an investigation of public sources and the new executive's consequent heightened concerns. The new executive explained, "[w]e need to ensure, by obtaining a third party opinion . . . that Shell Company A and its beneficiaries and officers do not have any connections to [a high-ranking Uzbek government official's] family or to government officials of Uzbekistan." The new executive continued, "We need to re-check the previous transaction for acquisition of Uzdunrobita to make sure there are no risks of potential persecution for the purchase of shares from [Foreign Official] (if they were actually purchased from [Foreign Official])." The new executive emphasized, "From the reputational point of view, we should exclude any association between MTS and [Foreign Official] – [a] profile is attached."

29.     The new executive attached to the February 12, 2007 email a series of articles about Foreign Official from internet sources, which included that: Foreign Official had set up Shell Company A, which "received" 20% of Uzdunrobita from American Company and 31.4% from the Uzbek government; Foreign Official had an official role in the Uzbek government and influence with a high-ranking Uzbek government officials; Foreign Official had amassed a "large business empire" through "corrupt means" and that part of Foreign Official's holdings was "the

largest wireless telephone operator in Uzbekistan," which, at the time, was Uzdunrobita; and Foreign Official had substantial influence in the Uzbek government, including in the telecommunications sector.

30.     In addition to the articles above, the new executive also attached a memo to his February 12, 2007 email, which stated that MTS faced FCPA risks because "[i]n public sources, including transcripts of court proceedings, it was stated that in 2004, [MTS] acquired a majority stake in 'Uzdunrobita' in the transaction, where one of the selling shareholders was [Foreign Official]." The memo further noted that the high-ranking Uzbek government official related to Foreign Official "held office at the time of the transaction." The memo ended with a list of risks that included, "1) Reputational risk — [Foreign Official]," "2) FCPA risk," and "3) the risk of a regime change and of the revision of the privatization/acquisition of licenses."

31.     In response to the new executive's emails, certain MTS management took steps to restrict further dissemination of the new executive's concerns about the Foreign Official.

32.     Because the new executive insisted that MTS conduct additional due diligence, MTS hired a U.S. law firm to conduct due diligence on Shell Company A. In an effort to ensure that the legal opinion would be favorable, certain MTS management did not disclose certain relevant information to the law firm, including the crucial fact that certain MTS management knew that Foreign Official was the beneficial owner of Shell Company A.

33.     On or about April 2, 2007, in part due to Foreign Official's influence, UzACI granted Uzdunrobita licenses for additional frequencies.

34.     On or about April 12, 2007, Shell Company A sent notice to MTS of its intention to exercise its put option under the Amended Option Agreement. On or about April 27, 2007,

MTS and Shell Company A jointly engaged an investment bank to value Shell Company A's remaining interest in Uzdunrobita. The bank estimated that 26% of Uzdunrobita was worth approximately $250 million, including 26% of the value of the additional licenses.

35.    On or about May 25, 2007, certain MTS management circulated a presentation about MTS's negotiating position regarding the deal, including expressing concern that Foreign Official would expect that the entire value of the licenses would be added to the price for 26% of Uzdunrobita's shares, ultimately demanding a payment of $375 million. The presentation noted that MTS would be "deprived of protection from [the] consequences of loss of partner [*i.e.*, Foreign Official]."

36.    On or about June 26, 2007, MTS's Board of Directors approved the $250 million payment to Shell Company A. On or about June 28, 2007, MTS transferred approximately $250 million to Shell Company A's bank account in Hong Kong, via wire transfers through correspondent bank accounts at financial institutions in New York, New York.

37.    During this time period, Foreign Official was also utilizing Executive 2 to negotiate similar bribe payments from MTS's and Uzdunrobita's competitors, Unitel and Coscom, as also admitted by Unitel and Coscom. Specifically, Executive 2 helped Foreign Official obtain a 26% ownership interest in both Unitel and Coscom, through Shell Company A, with the knowledge of certain MTS management. Certain MTS management permitted Executive 2 to assist its competitors because it understood that doing so would allow MTS to continue to do business in the Uzbek telecommunications sector.

12

### C.  Corrupt Payment of $30 Million through Shell Company B in 2008-2009

38.     On or about April 15, 2008, Executive 2 emailed Executive 1 concerning a letter from UzACI.  Attached to the email was a notice from UzACI concerning purportedly bad connection quality for local and inter-city calling in violation of Uzdunrobita's license.  The notice stated that if those violations were not corrected within one month, Uzdunrobita's license could be suspended or revoked.  Later that day, Executive 1 forwarded the email to certain MTS management, stating that Executive 2 "had warned us that [Foreign Official] will be taking revenge" for MTS's decision to decline to engage in another transaction for the benefit of Foreign Official.

39.     On or about April 15, 2008, Executive 2 forwarded Executive 1 another adverse letter from an Uzbek state-owned entity.  Executive 1 forwarded the letter to certain MTS management stating, "Continuation of the pressure."

40.     During the summer of 2008, certain MTS management continued to discuss how to address Foreign Official's demands for additional improper payments.  On or about July 3, 2008, Executive 1 emailed certain MTS management a list of the "Problems in Uzbekistan." The list included official currency conversion, "[p]eriodic (initiated by the [Foreign Official] or by [Executive 2]) claims of the [telecom] regulator . . . ," and Executive 2's "participation in [C]oscom Company [a competitor of Uzdunrobita] management (more than 30% belong to [Foreign Official].").  Executive 1 noted several problems, including Executive 2's "connections in the state authorities under [Foreign Official's] auspices" and that the frequencies that Foreign Official was offering lacked "legal 'cleanliness'" because they "were taken away illegally."  In offering solutions, Executive 1 suggested "direct bargaining with [Foreign Official]" for

13

telecommunications licenses, construction and operation permits, and currency conversion and that there be an "amount of annual subscription fee for 'happiness,' but under our management." To accomplish this, Executive 1 suggested a "direct meeting with [Foreign Official] and [a high-ranking MTS executive]" without Executive 2's "knowledge and participation."

41.     On or about July 20, 2008, Executive 1 emailed certain MTS management asking for input on an attached memo. The memo explained that "[t]he Third Party [Foreign Official] is making a demand that [MTS] pay $50 mln . . ." The memo cautioned, however, that "outright rejection of the payments" or replacement of Uzdunrobita's management could lead to potential consequences, including "the Third Party [*i.e.*, Foreign Official] creating difficulties (of various kinds)" for Uzdunrobita's business, "suspension" of Uzdunrobita's operations, or the forced sale of Uzdunrobita. Executive 1 noted that there were not "available legal options" to "provide reliable protection from the Third Party [*i.e.*, Foreign Official]." The memo went on to explain that a "decision has been made to resume direct negotiations with the Third Party [*i.e.*, Foreign Official]" and discussed in detail possible payment methods for the benefit of Foreign Official and various governmental benefits that MTS hoped it could obtain, including "expansion of existing licenses," currency conversion, and tax and customs benefits.

42.     Thereafter, an MTS foreign subsidiary entered into a contract with Shell Company B, whose beneficial owner certain MTS management knew was Foreign Official. Under the proposed contract, the foreign MTS subsidiary would pay Shell Company B approximately $30 million in exchange for Shell Company B's subsidiary repudiating various telecommunications frequencies and the reassignment of those frequencies by UzACI to Uzdunrobita.

43.     On or about August 19, 2008, certain MTS management sent a due diligence firm incorporation information about Shell Company B, including Associate B's name.

44.     Certain MTS management, however, did not provide the due diligence firm with certain relevant information concerning Shell Company B, including the crucial fact that certain MTS management knew that Foreign Official beneficially owned Shell Company B.

45.     One day later, on or about August 20, 2008, before the due diligence was completed on the transaction, Executive 2 emailed certain MTS management, including Executive 1, a copy of a finalized but undated agreement between an MTS foreign subsidiary and Shell Company B, signed by Associate B.   Executive 2 explained, "I need to get info from you about the date they shall be dated, because I should start processing tra[n]sfer of frequencies to Uzdunrobita [...] today."  The executed agreement between an MTS foreign subsidiary and Shell Company B was dated August 21, 2008.  On or about August 28, 2008, certain MTS management, copying Executive 1, emailed the executed agreement with Shell Company B to Executive 2.

46.     In or around this time, certain MTS management discussed the need for Board of Directors approval of the loan between MTS and the MTS foreign subsidiary that would fund the agreement. On or about August 22, 2008, Executive 1 emailed certain MTS management that "[w]e will do a little work on the justification for the Board of Directors," and asked certain MTS management, "please come up with something non-traditional, deadline is Aug 29."

47.     On or about August 25, 2008, UzACI issued an order allocating the frequencies earlier repudiated by Shell Company B's subsidiary to Uzdunrobita.

48.   On or about August 29, 2008, an executive at the due diligence firm sent certain MTS management an email with a draft report on Shell Company B.   The email explained that although "some enquires remain outstanding, I hope the report contains the idea as to how the main angle – that is FCPA – is affected." The report referred to information that Shell Company B was "beneficially owned by the family of [a high-ranking Uzbek government official]," and that Associate B was "a trustee of [Foreign Official]" and worked for Foreign Official.   The report further documented international press articles that also reported that Shell Company B was beneficially owned by the family of a high-ranking Uzbek government official.  It also noted that Shell Company B was a minority owner of both of Uzdunrobita's competitors in Uzbekistan, Unitel and Coscom.

49.   Despite the issues raised in the due diligence report, MTS continued to execute the agreement with Shell Company B.  On or about September 4, 2008, the Board approved a funding mechanism in the form of a $30 million loan to the foreign subsidiary. The Board was advised only that the loan was "[f]or financing of operational activity and possible implementation of projects in the future."

50.   On or about September 5, 2008, MTS entered into a $30 million loan agreement with its foreign subsidiary to fund the agreement between the MTS foreign subsidiary and Shell Company B.

51.   On or about September 19, 2008, Executive 1 sent certain MTS management an email with the subject "question re: U" with no content.  Attached to the email was a PowerPoint slide listing the "Status of our requests" and the "Status of our commitments." The requests listed were various governmental benefits, including currency conversion, tax benefits, and a bilateral

agreement with the Uzbek government on the protection of investments, noting that the requests had been refused except that Foreign Official accepted "a request for conversion of $3 million for the repayment of the Company's outstanding debts." The slide identified MTS's commitments as "a payment of the total amount of $50 million" and "[b]eginning in 2009, for the assistance in creating favorable conditions for the growth of the Company and its subscriber base, guarantee [of] the payment of an average of $20 million/year." Beneath the $50 million figure, the slide noted "$30 million through the purchase of [telecommunications] frequencies, prior to 01/11/08" followed by "MTS is ready to make the payment immediately."

52.    On or about the following dates, MTS, or an MTS foreign subsidiary, made the following payments to Shell Company B's bank accounts for Foreign Official's benefit, via wire transfers through correspondent bank accounts at financial institutions in New York, New York.

| Date | Sender | Recipient | Recipient's Bank | Amount |
| --- | --- | --- | --- | --- |
| October 21, 2008 | MTS | Shell Company B | Riga, Latvia | $5,000,000 |
| February 6, 2009 | MTS subsidiary | Shell Company B | Hong Kong | $5,000,000 |
| March 5, 2009 | MTS subsidiary | Shell Company B | Hong Kong | $5,000,000 |
| April 28, 2009 | MTS subsidiary | Shell Company B | Hong Kong | $5,000,000 |
| June 17, 2009 | MTS subsidiary | Shell Company B | Hong Kong | $5,000,000 |
| July 14, 2009 | MTS | Shell Company B | Hong Kong | $5,000,000 |

53.    On or about November 2, 2009, Executive 1 emailed himself a presentation including an updated copy of the slide referenced in paragraph 51. The updated version of the

slide stated that MTS's obligations relating to a "[telecommunications] frequencies acquisition for $30 mln by 01.11.08" were "Paid in full in July 2009."

### D. Corrupt Payment of $39.6 Million Through Acquisition of KOLORIT in 2009

54.    As discussed in paragraph 41, on or about July 20, 2008, Executive 1 emailed certain MTS management a memo stating that "[t]he Third Party [Foreign Official] is making a demand that [MTS] pay $50 mln . . . ." "by acquiring an asset" whose value was "overstated," which was "unattractive" to MTS's "development strategy" and whose size would be "impossible to explain to the investment community."

55.    As discussed in paragraph 51, on or about September 19, 2008, Executive 1 sent certain MTS management a slide indicating a $50 million commitment to Foreign Official for various government benefits.  The slide showed that, after the $30 million for the agreement with Shell Company B was taken into account, the remaining balance was "$20 million." The slide also contemplated an additional "$20 million/year" for "assistance in creating favorable conditions for the growth of the company."  Both amounts were followed by the notations, "The basis for payment and the draft agreement are being worked out."  The slide noted that "no scheme exists other than making the payment as a fee for services.  Proposing to increase the amount of the contract pertaining to [telecommunications frequencies], with delayed payments."

56.    On or about December 11, 2008, certain MTS management, including Executive 1, received a report about the possible acquisition of KOLORIT.  The report noted that KOLORIT was "connected to MTS by a long history of relations" and that it "was created by the same shareholders as Uzdunrobita before it."  Noting that MTS and KOLORIT had articulated reasons for the acquisition, the report stated that "[i]n my opinion, the main reason [for the

acquisition] is the interest of the founders on the Uzbekistani side and certain internal agreements. [KOLORIT] was created and developed exclusively as a result of activities of the founders of Uzdunrobita; a clear connection is maintained today as well." The report further noted that "the reason for the sale of KOLORIT for [KOLORIT]'s ownership is unclear," that KOLORIT did not need the sale for its development, and that "maybe, there are hidden economic factors that will not be disclosed to an external expert."

57.     On or about April 9, 2009, certain MTS management wrote Executive 1, stating that the KOLORIT "transaction is a toxic one" and that "I think that we need to get the transaction to [MTS's Investment Committee]. Let [certain MTS management] and the [Investment Committee] members share liability."

58.     On or about July 28, 2009, certain MTS management emailed an executive at the same due diligence firm MTS had contracted with for due diligence on Shell Company B.   The email requested the firm "initiate as quickly as possible an FCPA investigation of the following companies that are participants in [KOLORIT]." Certain MTS management, however, did not disclose certain relevant information to the due diligence firm, including the crucial fact that certain MTS management knew that Foreign Official would benefit from the transaction.

59.     On or about August 7, 2009, certain MTS management received a memo from MTS's Department of Strategic Planning for the August 10, 2009 MTS Investment Committee meeting, recommending rejection of the KOLORIT acquisition because the acquisition was not part of MTS's "core business" and the estimate for advertising market development was "not realistic." The memo explained, "Within [the] framework of qualitative analysis, it's hard to imagine—within [the] framework of this poor country (171st rank in GDP – per capita (PPP) and

185th rank in inflation rate), just one outdoor local advertising company could cost 40 MUSD. This is a pure fairy tale!" Certain internal and external valuations of KOLORIT were significantly less than the recommended purchase price.

60.     On or about August 14, 2009, certain MTS management received a report from the due diligence firm explaining that Uzbek corporate records indicated that Associate B and another individual were the shareholders of KOLORIT.  The report further noted that Foreign Official and Associate B had various connections, but "[s]ources are unaware if [Associate B] represents the interests of [Foreign Official] at [KOLORIT]."  Although certain MTS management received the report, which stated that rumors that KOLORIT might be beneficially owned by Foreign Official were not considered credible, certain MTS management in fact knew that Foreign Official was the beneficial owner of KOLORIT.

61.     On or about September 16, 2009, Executive 1 presented the KOLORIT transaction to MTS's Board of Directors, which approved it.  The Board materials for the meeting included the inflated valuation for KOLORIT and did not disclose that Foreign Official would benefit from the transaction.

62.     On or about September 22, 2009, Uzdunrobita, through Executive 2, entered into share purchase agreements with the shareholders of KOLORIT.  On or about that same day, September 22, 2009, Uzdunrobita, through Executive 2, and the shareholders of KOLORIT executed statements of transfer and acceptance of equity interest.

63.     On or about September 22, 2009, Uzdunrobita paid the shareholders of KOLORIT a total of approximately $39,636,711 equivalent in Uzbek som.

64.     On or about September 22, 2009, an MTS subsidiary entered into a share purchase agreement with a shareholder of KOLORIT, which was executed by certain MTS management.

65.     On or about September 29, 2009, an MTS subsidiary transferred $17,000 to the Uzbek account of a shareholder in Uzbekistan, through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

66.     As discussed in paragraph 53, on or about November 2, 2009, Executive 1 emailed himself a presentation including an updated copy of the slide referenced in paragraph 51. The slide stated that MTS's $50 million obligation had been "Paid in full in September 2009," including "through [KOLORIT] acquisition." The presentation also proposed "[t]o tie strictly further execution of our obligations with the partner's [*i.e.*, Foreign Official] ones." The presentation also noted problems with changing Uzdunrobita's management, specifically Executive 2, including that there was "[n]o full support from the country's political circles to the change of this kind yet unless the Partner [*i.e.*, Foreign Official] supports" and there would be "[n]o one able to deal with the acquired [KOLORIT]." It also noted that Uzdunrobita could lose its "existing currency exchange opportunities" and "the acquired frequencies," or even face the "[r]ecall of the license in some of the regions."

### E.  Corrupt Payment of $1.1 Million to Purported Charities and for Sponsorships in 2012

67.     In or around 2012, Foreign Official requested Uzdunrobita pay bribes in violation of U.S. law to entities related to Foreign Official as purported charitable donations or sponsorship payments.  In response to these requests, between on or about March 27, 2012 and

on or about May 21, 2012, Uzdunrobita paid the equivalent of approximately $1,139,137 in Uzbek som.

68.     On or about March 27, 2012, Uzdunrobita paid at least the equivalent of $1,084,892.87 in Uzbek som to entities related to Foreign Official.  The only basis for these payments was letters from entities related to Foreign Official that were sent to Uzdunrobita requesting contributions.

69.     On or about March 29, 2012, Executive 2 sent Executive 1 a memorandum asking for approval from Uzdunrobita's Supervisory Board for 2 billion Uzbek som ($1,084,892.87) for payment for purported "charitable assistance" to various entities related to Foreign Official.

70.     On or about April 24, 2012, Uzdunrobita sent a payment order to an entity related to Foreign Official for the equivalent of 100 million Uzbek som as a purported advance payment for sponsorship aid.

71.     On or about May 21, 2012, Uzdunrobita received an invoice and a work completion act from the same entity related to Foreign Official identified in Paragraph 70 for 100 million in Uzbek som for purported "[s]ponsor support and organization of the 10th anniversary event" of the entity.

72.     On or about June 27, 2012, Uzdunrobita's Supervisory Board retroactively approved the above purported charity payments, discussed above in paragraph 69.

73.     Uzdunrobita made the above payments in violation of internal procedures that required preapproval of payments of those amounts.

**F. Uzbekistan Expropriates Most of Uzdunrobita's Assets in 2012**

74.     In or around the first half of 2012, Foreign Official became increasingly dissatisfied with MTS, Uzdunrobita, and Executive 2 because Uzdunrobita did not pay additional bribes for the benefit of Foreign Official.  Consequently, Foreign Official began to threaten retaliation against the company.

75.     On or about May 25, 2012, Executive 1 emailed certain MTS management that Foreign Official believed that "[Executive 2] and the company stopped being loyal to [Foreign Official] to the end."  In or around June 2012, Associate B threatened to have Executive 2 and other Uzdunrobita executives arrested unless Foreign Official's bribe demands were met.  In response, Executive 2 fled Uzbekistan on or about June 6, 2012.

76.     Foreign Official's retaliation against MTS and Uzdunrobita continued.  On or about August 13, 2012, an Uzbek court granted UzACI's petition to withdraw all operating licenses from Uzdunrobita, which ended Uzdunrobita's ability to operate in the telecommunications sector in Uzbekistan.  On or about August 27, 2012, Uzdunrobita's appeal of the decision was denied.

77.     On or about August 29, 2012, MTS filed a Form 6-K with the SEC stating that it was taking a $579 million impairment charge of goodwill and assets in Uzbekistan as well as a $500 million provision for tax and anti-monopoly claims in Uzbekistan.

<u>**MTS's Failure to Implement and Enforce Adequate Internal Accounting Controls**</u>

78.     Throughout the relevant time period, because MTS failed to implement adequate internal accounting controls and failed to enforce the internal accounting controls it did have in place, it made the corrupt payments for the benefit of the Foreign Official.

79.    MTS's lax internal control environment included a failure to require approval for certain transactions and a failure to comply with the established management approval requirements with respect to other transactions. The 2006 option amendment never was approved by MTS's Board of Directors. MTS's 2008 loan agreement with its foreign subsidiary to fund the payments to Shell Company B was approved by MTS's Board of Directors after the agreement with Shell Company B had been executed. And Uzdunrobita made the purported sponsorship and charity payments without approval of the Uzdunrobita Supervisory Board, which Uzdunrobita's internal procedures required.

80.    MTS had inadequate disclosure controls and failed to follow established corporate governance procedures with respect to certain public statements made during the relevant period. For example, on or about June 13, 2012, a letter was sent from MTS addressed to the Prosecutor General's Office in Uzbekistan that stated that Executive 2 had made "inappropriate expenditures and plunder[ed] the property belonging to the Company." The letter further stated that MTS wished to "restore the normal working order in the company," "rectify the faults" and "locate [Executive 2]," "including by seeking the assistance of INTERPOL." On or about June 25, 2012, MTS contradicted and retracted the June 13, 2012 letter, asserting that it had been "provided by [a] mistake caused by a technical malfunction and failure in the internal document workflow," when in fact there was no technical malfunction. Rather, MTS internal controls were not adequate to prevent the letter from being issued without proper review and authorization from the appropriate MTS management.

81.    MTS also failed to follow established corporate governance protocols with respect to the role of the Board of Directors, including shareholder involvement, in certain aspects of its

investment in Uzbekistan. For example, during the first quarter of 2007, Uzdunrobita's management acquired a 1.5% interest in an Uzbek company without obtaining the approval of the MTS Board of Directors. Similarly, as noted in paragraph 80, the June 13 and 25, 2012, letters were issued without the participation or knowledge of the Board of Directors.

82.    MTS failed to implement an adequate system for conducting, recording, and verifying due diligence on third parties to uncover their true nature, beneficial ownership, and possible corruption risks. MTS lacked procedures for the management of due diligence results. As demonstrated above, certain MTS management withheld crucial information from outside counsel and due diligence professionals such that the advice given was without value.

83.    MTS also lacked adequate payment controls. For example, it made payments from entities other than entities that had executed contracts and had no policy regarding payments to bank accounts located in places where the contractual partner neither performed work nor had operations.

84.    MTS also knowingly lacked a sufficient internal audit function to provide reasonable assurances that corporate assets were not used to pay bribes to foreign officials and failed to conduct adequate internal audits to detect and prevent criminal activity.

85.    MTS's failures to implement and enforce adequate internal controls contributed to an environment where it was possible for MTS and Uzdunrobita executives to make improper payments of over $420 million for the benefit of Foreign Official between 2004 and 2012. MTS also had particularly severe deficiencies in its general compliance function and its anticorruption compliance policies and procedures. Among other deficiencies, prior to mid-2012, MTS did not have a Chief Compliance Officer or Compliance Department.

## Scheme to Falsify Books and Records

86.     As a result of MTS's failure to implement effective internal accounting controls, MTS, acting through its executives and others, disguised on its books and records over $420 million in bribe payments in violation of U.S. law made for the benefit of Foreign Official in exchange for MTS's and Uzdunrobita's ability to enter and continue to operate in the Uzbek telecommunications sector.

87.     In relation to the above-described payments, certain MTS management and others used a variety of non-transparent transactions with different false purported business purposes, described above, so that the payments would be inaccurately recorded in MTS's consolidated books and records as legitimate transactions.

88.     The following payments were inaccurately recorded in MTS's consolidated books and records:

       a.     A payment on or about July 29, 2004 for approximately $100 million to an escrow account for the benefit of Shell Company A in the United Kingdom.

       b.     A payment on or about June 28, 2007 for approximately $250 million to Shell Company A's bank account in Hong Kong.

       c.     A payment on or about October 21, 2008 for approximately $5 million to Shell Company B's bank account in Latvia.

       d.     A payment on or about February 6, 2009 for approximately $5 million to Shell Company B's bank account in Hong Kong.

       e.     A payment on or about March 5, 2009 for approximately $5 million to Shell Company B's bank account in Hong Kong.

f.      A payment on or about April 28, 2009 for approximately $5 million to Shell Company B's bank account in Hong Kong.

g.      A payment on or about June 17, 2009 for approximately $5 million to Shell Company B's bank account in Hong Kong.

h.      A payment on or about July 14, 2009 for approximately $5 million to Shell Company B's bank account in Hong Kong.

i.      Payments on or about September 22, 2009 for a total of approximately $39,636,711 equivalent in Uzbek som to the shareholders of KOLORIT.

j.      A payment on or about September 29, 2009 for approximately $17,000 to a shareholder of KOLORIT's account in Uzbekistan.

k.      Payments between in or around March 27, 2012 and or about May 21, 2012 for a total of approximately $1,084,892.87 in Uzbek som to entities related to Foreign Official.

89.     MTS also created, and caused to be created, false records further to conceal these improper payments.  The bribe payments were concealed by fake contracts that were intended to create the appearance of legitimacy and were falsely described in Board materials.

## STATUTORY ALLEGATIONS

### COUNT ONE
**(Conspiracy to Violate the FCPA)**

90.     Paragraphs 1 through 89 of this Information are realleged and incorporated by reference as if fully set forth herein.

91.     From at least in or around 2004 up to and including in or around 2012, in the Southern District of New York and elsewhere, MTS, the defendant, together with Executive 1,

27

Executive 2, Associate A, Associate B, Uzdunrobita, Shell Company A, Shell Company B,

KOLORIT, and others known and unknown, willfully and knowingly did combine, conspire,

confederate, and agree together and with each other to commit offenses against the United States,

that is, to violate the anti-bribery and books and records provisions of the FCPA.

92.     It was a part and object of the conspiracy that MTS, the defendant, being an

issuer, together with Executive 1, Executive 2, Associate A, Associate B, Uzdunrobita, Shell

Company A, Shell Company B, KOLORIT, and others known and unknown would and did

willfully make use of the mails and means and instrumentalities of interstate commerce corruptly

in furtherance of an offer, payment, promise to pay, and authorization of the payment of any

money, offer, gift, promise to give, and authorization of the giving of anything of value to a

foreign official and to a person, while knowing that all or a portion of such money and thing of

value would be and had been offered, given, and promised, directly and indirectly, to a foreign

official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her

official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the

lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign

official to use his or her influence with a foreign government and agencies and instrumentalities

thereof to affect and influence acts and decisions of such government and agencies and

instrumentalities, in order to assist MTS in obtaining and retaining business for and with, and

directing business to, MTS, Uzdunrobita, and others, in violation of Title 15, United States Code,

Section 78dd-1(a).

93.     It was further a part and object of the conspiracy that MTS, the defendant, being

an issuer, together with Executive 1, Executive 2, Associate A, Associate B, Uzdunrobita, Shell

Company A, Shell Company B, KOLORIT, and others known and unknown, would and did knowingly and willfully falsify and cause to be falsified books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of MTS, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a).

### Manner and Means of the Conspiracy

94.    The manner and means by which MTS and its co-conspirators sought to accomplish the objects of the conspiracy included, among other things, the following:

a.    MTS and its co-conspirators paid approximately $100 million for a 33% stake in Uzdunrobita knowing that Shell Company A was beneficially owned by Foreign Official in exchange for Foreign Official permitting Uzdunrobita to conduct business in Uzbekistan.

b.    MTS and its co-conspirators entered into an amended option agreement for Shell Company A's remaining stake in Uzdunrobita that was for the benefit of Foreign Official in exchange for allowing Uzdunrobita to continue to operate in Uzbekistan.

c.    MTS and its co-conspirators paid approximately $250 million to Shell Company A when Shell Company exercised its option to sell the remaining stake in Uzdunrobita knowing that Shell Company A was beneficially owned by Foreign Official in exchange for allowing Uzdunrobita to continue to operate in Uzbekistan.

d.    MTS and its co-conspirators paid approximately $30 million to Shell Company B for Foreign Official's benefit in exchange for obtaining frequencies from UzACI and to continuing to operate in Uzbekistan.

e.      MTS and its co-conspirators paid approximately $39.6 million for the acquisition of KOLORIT knowing that the price paid was inflated in order to compensate Foreign Official in exchange for allowing Uzdunrobita to continue to operate in Uzbekistan.

f.      MTS and its co-conspirators paid approximately $1.1 million in bribes to entities related to Foreign Official for purported charities or sponsorships in exchange for allowing Uzdunrobita to continue to operate in Uzbekistan.

g.      MTS and its co-conspirators falsely recorded in MTS's consolidated books and records the payments listed above in Paragraph 94(a-f).

### Overt Acts

95.     In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.      On or about July 29, 2004, MTS transferred approximately $100 million from an account in Russia to an escrow account in the United Kingdom for the benefit of Shell Company A, which was wired into and out of U.S. correspondent bank accounts located in the Southern District of New York.

b.      On or about June 28, 2007, MTS transferred approximately $250 million from an account in Russia to Shell Company A's account in Hong Kong, which was wired into and out of U.S. correspondent bank accounts located in the Southern District of New York.

c.      On or about October 21, 2008, MTS transferred approximately $5 million from an account in Russia to Shell Company B's account in Latvia, which was wired into and out of U.S. correspondent bank accounts located in the Southern District of New York.

d.      On or about February 6, 2009, an MTS foreign subsidiary transferred approximately $5 million from an account in Bermuda to Shell Company B's account in Hong Kong, which was wired into and out of U.S. correspondent bank accounts located in the Southern District of New York.

e.      On or about March 5, 2009, an MTS foreign subsidiary transferred approximately $5 million from an account in Bermuda to Shell Company B's account in Hong Kong, , which was wired into and out of U.S. correspondent bank accounts located in the Southern District of New York.

f.      On or about April 28, 2009, an MTS foreign subsidiary transferred approximately $5 million from an account in Bermuda to Shell Company B's account in Hong Kong, which was wired into and out of U.S. correspondent bank accounts located in the Southern District of New York.

g.      On or about June 17, 2009, an MTS foreign subsidiary transferred approximately $5 million from an account in Bermuda to Shell Company B's account in Hong Kong, which was wired into and out of U.S. correspondent bank accounts located in the Southern District of New York.

h.      On or about July 14, 2009, MTS transferred approximately $5 million from an account in Bermuda to Shell Company B's account in Hong Kong, which was wired into and out of U.S. correspondent bank accounts located in the Southern District of New York.

i.      On or about September 22, 2009, Uzdunrobita transferred approximately 7.8 billion Uzbek som to a shareholder of KOLORIT.

j.      On or about September 22, 2009, Uzdunrobita transferred approximately

31

44.2 billion Uzbek som to a shareholder of KOLORIT.

        k.     On or about September 22, 2009, Uzdurnrobita transferred approximately 555 million Uzbek som to a shareholder of KOLORIT.

        l.     On or about September 22, 2009, Uzdunrobita transferred approximately 3.145 billion Uzbek som to a shareholder of KOLORIT.

        m.     On or about September 22, 2009, Uzdunrobita transferred approximately 551.25 milion Uzbek som to a shareholder of KOLORIT.

        n.     On or about September 22, 2009, Uzdunrobita transferred approximately 3,123,750 Uzbek som to a shareholder of KOLORIT.

        o.     On or about September 29, 2009, an MTS subsidiary transferred $17,000 from an account in Russia to the Uzbek account of a shareholder of KOLORIT, which was wired into and out of U.S. correspondent bank accounts located in the Southern District of New York.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Violation of the Internal Controls Provisions of the FCPA)

96.     Paragraphs 1 through 89 and 94 through 95 of this Information are realleged and incorporated by reference as if fully set forth herein.

97.     From in or around 2004 through in or around 2012, MTS knowingly and willfully failed to implement a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; (ii) transactions were recorded as necessary to (A) permit preparation of financial statements in conformity with generally accepted accounting principles or any other

criteria applicable to such statements, and (B) maintain accountability for assets; (iii) access to assets was permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets was compared with the existing assets at reasonable intervals, and appropriate action was taken with respect to any differences, *to wit*: MTS knowingly and willfully failed to implement, among other controls: (i) a system for conducting, recording, and verifying due diligence on third parties to uncover their true nature, beneficial ownership, and possible corruption risks; (ii) sufficient requirements for approval of certain transactions; (iii) policies and oversight to ensure adherence to established management approval requirements for certain transactions; (iv) sufficient procedures for MTS disclosures; (v) oversight to ensure adherence to existing disclosure controls; (vi) oversight to ensure adherence to corporate governance protocols with respect to the role of the Board of Directors, including shareholder involvement; (vii) policies and oversight regarding payments to bank accounts located in places where the contractual partner neither performed work nor had operations; and (vii) a sufficient audit function to provide reasonable assurances that corporate assets were not used to make bribery payments to foreign officials.

(Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5),
and 78ff(a); Title 18, United States Code, Section 2.)

### FORFEITURE ALLEGATION

98.     As a result of committing the offense alleged in Count One of this Information, MTS, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said

offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

### Substitute Assets Provision

99.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

       a.     cannot be located upon the exercise of due diligence;

       b.     has been transferred or sold to, or deposited with, a third person;

       c.     has been placed beyond the jurisdiction of the Court;

       d.     has been substantially diminished in value; or

       e.     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981(a)(1)(C);
Title 21, United States Code, Section 853(p);
Title 28, United States Code, Section 2461(c))

ROBERT A. ZINK
Acting Chief, Fraud Section

GEOFFREY S. BERMAN
United States Attorney

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

– v. –

### MOBILE TELESYSTEMS PJSC,

**Defendant.**

### <u>INFORMATION</u>

19 Cr. _____

(15 U.S.C. §§ 78m and 78ff(a);
18 U.S.C. §§ 371 and 2.)

<u>GEOFFREY S. BERMAN</u>
United States Attorney

<u>ROBERT A. ZINK</u>
Acting Chief, Fraud Section, Criminal Division
U.S. Department of Justice

*30 min*

*3/6/19*

Filed Information and Waiver of Indictment.
Defendant Mobile Telesystems PJSC present by corporate representative Andrey Kamensky with attorney Gary DiBianco and Lanny A. Breuer; AUSA Edward Imperatore present with Department of Justice counsel Niocola J. Mrazek; Court Reporter present. Defendant arraigned and enters a plea of NOT GUILTY. Prosecution is deferred until 6/6/22. Time is excluded until 3/6/22.

Oetken, J.

Submitted by        Bruce Hampton
                    Courtroom Deputy