

**U.S. Department of Justice**

*United States Attorney*          *Criminal Division*
*Southern District of New York*   *Fraud Section*

---

*The Silvio J. Mollo Building*      *Bond Building*
*One Saint Andrew's Plaza 950*      *1400 New York Ave, NW 11th*
*New York, New York 10007*          *Floor*
                                    *Washington, DC 20005*

February 22, 2019

Gary DiBianco, Esq.
Mitchell Ettinger, Esq.
Kara Roseen, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Ave, NW
Washington, DC 20005

Lanny Breuer, Esq.
Benjamin Haley, Esq.
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956

     Re:    *United States v. Mobile TeleSystems PJSC* Deferred Prosecution Agreement

Dear Counsel:

     Defendant Mobile TeleSystems PJSC ("MTS" or the "Company") pursuant to authority granted by the Company's Board of Directors reflected in Attachment B, and the United States Department of Justice, Criminal Division, Fraud Section and the Office of the United States Attorney for the Southern District of New York (the "Fraud Section and the Office"), enter into this deferred prosecution agreement (the "Agreement").

### <u>Criminal Information and Acceptance of Responsibility</u>

     1.    The Company acknowledges and agrees that the Fraud Section and the Office will file the attached two-count criminal Information in the United States District Court for the

Southern District of New York charging the Company with one count of conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery and books and records provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, *see* Title 15, United States Code, Sections 78dd-1, 78m(b)(2)(A), 78m(b)(5), and 78ff(a), and one count of violating the internal controls provisions of the of the FCPA, *see* Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5), and 78ff(a).  In so doing, the Company: (a) knowingly waives its right to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect to venue for the charges brought by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A (the "Statement of Facts"), and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of New York.  The Fraud Section and the Office agree to defer prosecution of the Company pursuant to the terms and conditions described below.

2.      The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate.  Should the Fraud Section and the Office pursue the prosecution that is deferred by this Agreement, the Company stipulates to the admissibility of the attached Statement of Facts in any proceeding by the Fraud Section and the Office, or any other component of the Department of Justice, including

at any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the attached Statement of Facts at such proceeding.

### Term of the Agreement

3.      This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from the later of the date on which the Information is filed or the date on which the independent compliance monitor (the "Monitor") is retained by the Company, as described in Paragraphs 11-13 below (the "Term").  The Company agrees, however, that, in the event the Fraud Section and the Office determine, in their sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Fraud Section and the Office, in their sole discretion, for up to a total additional time period of one year, without prejudice to the Fraud Section and the Office's right to proceed as provided in Paragraphs 16-18 below.  Any extension of the Agreement extends all terms of this Agreement, including the terms of the monitorship in Attachment D, for an equivalent period.  Conversely, in the event the Fraud Section and the Office find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the monitorship in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early. If the Court rejects the Agreement, all the provisions of the Agreement shall be deemed null and void, and the Term shall be deemed to have not begun.

### Relevant Considerations

4.      The Fraud Section and the Office enter into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

   a. the Company did not receive voluntary disclosure credit pursuant to the FCPA Corporate Enforcement Policy in the Department of Justice Manual ("JM") 9-47.120, or pursuant to the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") because it did not voluntarily and timely self-disclose to the Fraud Section and the Office the conduct described in the Statement of Facts;

   b. the Company ultimately provided to the Fraud Section and the Office all relevant facts known to it, including information about the individuals involved in the conduct described in the Statement of Facts and fully cooperated as that term is used in the Sentencing Guidelines, including by voluntarily providing documents located outside the United States, providing summaries of the Company's internal investigation, translating foreign-language documents, and providing counsel for certain witnesses;

   c. the Company did not receive additional credit for cooperation and remediation pursuant to the FCPA Corporate Enforcement Policy, JM 9-47.120, because it significantly delayed production of certain relevant materials, refused to support interviews with current employees during certain periods of the investigation, and did not appropriately remediate, including by failing to take adequate disciplinary measures with respect to executives and other employees involved in the misconduct;

   d. although the Company had inadequate anti-corruption controls and an inadequate program during the period of the conduct described in the Statement of Facts, the Company has been enhancing and has committed to continuing to enhance its compliance program and internal accounting controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement ("Corporate Compliance Program");

e.      because the Company has not yet fully implemented or tested its compliance program, the Company has agreed to the imposition of an independent compliance monitor to reduce the risk of misconduct (as set forth in Paragraphs 11-13 and Attachment D to this Agreement);

f.      the nature and seriousness of the offense conduct, including the payment of over $420 million in bribes in violation of U.S. law to a high-level government official in Uzbekistan over nine years in furtherance of a scheme that was carried out with the involvement of high-level executives at the Company;

g.      the Company has no prior criminal history;

h.      the Company has agreed to continue to cooperate with the Fraud Section and the Office in any ongoing investigation as described in Paragraph 5 below;

i.      the Company has resolved with the U.S. Securities and Exchange Commission ("SEC") through a cease-and-desist proceeding, relating to the conduct described in the Statement of Facts; and

j.      the mitigating factors present in this case, including that the Uzbek government expropriated the Company's telecommunications assets in Uzbekistan, resulting in no realized pecuniary gain to the Company as a result of the misconduct described in the Statement of Facts;

k.      accordingly, after considering (a) through (j) above, the Fraud Section and the Office believe that the appropriate resolution of this case is a deferred prosecution agreement with the Company, a guilty plea by its Uzbek subsidiary, KOLORIT DIZAYN INK Limited Liability Company  ("KOLORIT"), a financial penalty that is approximately 25% above the low-end of the Sentencing Guidelines fine range, and the imposition of an independent compliance

5

monitor; and, consistent with JM 1-12.100 (Coordination of Corporate Resolution Penalties in Parallel and/or Joint Investigations and Proceedings Arising from the Same Misconduct), the Fraud Section and the Office will credit the $100 million civil penalty imposed by the SEC as part of its resolution of this matter.

### Future Cooperation and Disclosure Requirements

5.      The Company shall cooperate fully with the Fraud Section and the Office in any and all matters relating to the conduct described in this Agreement and the Statement of Facts, and other conduct related to possible corrupt payments, false books and records, failure to implement adequate internal accounting controls, or circumvention of internal controls under investigation by the Fraud Section and the Office at any time during the Term, subject to applicable law and regulations, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the term specified in Paragraph 3 above.  At the request of the Fraud Section and the Office, the Company shall also cooperate fully with any other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the Multilateral Development Banks ("MDBs"), in any investigation of the Company, its subsidiaries or affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement, the Statement of Facts, and other conduct related to possible corrupt payments, false books and records, failure to implement adequate internal accounting controls, or circumvention of internal controls under investigation by the Fraud Section and the Office at any time during the Term of this Agreement.  The Company's cooperation pursuant to this Paragraph is subject to applicable law and regulations, including relevant data privacy and national security laws and regulations, as well as valid claims of

attorney-client privilege or attorney work product doctrine; however, the Company must provide to the Fraud Section and the Office a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company bears the burden of establishing the validity of any such an assertion.  The Company agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

a.     The Company shall truthfully disclose to the Fraud Section and the Office all factual information not protected by a valid claim of attorney-client privilege, work product doctrine, or applicable foreign laws, including relevant data privacy and national security laws and regulations with respect to its activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Fraud Section and the Office may inquire.  This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Fraud Section and the Office, upon request, any document, record or other tangible evidence about which the Fraud Section and the Office may inquire of the Company.

b.     Upon request of the Fraud Section and the Office, the Company shall designate knowledgeable employees, agents, or attorneys to provide to the Fraud Section and the Office the information and materials described in Paragraph 5(a) above on behalf of the Company, to the extent permitted by applicable laws or regulations.  It is further understood that the Company must at all times provide complete, truthful, and accurate information as requested by the Fraud Section and the Office.

c.     The Company shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section and the Office, present or former officers, directors,

employees, agents and consultants of the Company.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities.  Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

   d. With respect to any information, testimony, documents, records, or other tangible evidence provided to the Fraud Section and the Office pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable law and regulations (including relevant foreign data privacy and national security laws and regulations), to other governmental authorities, including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Fraud Section and the Office, in their sole discretion, shall deem appropriate.

   6. In addition to the obligations in Paragraph 5, during the Term, should the Company learn of any evidence or allegation of conduct that may constitute a violation of the FCPA anti-bribery or accounting provisions had the conduct occurred within the jurisdiction of the United States, the Company shall promptly report such evidence or allegation to the Fraud Section and the Office.

**<u>Payment of Monetary Penalty</u>**

   7. The Fraud Section and the Office and the Company agree that application of the Sentencing Guidelines to determine the applicable fine range yields the following analysis:

   a. The November 1, 2018 version of the Sentencing Guidelines apply to this matter.

      b.      <u>Offense Level</u>.  Based upon USSG § 2C1.1, the total offense level is 46,

calculated as follows:

| | |
|---|---|
| (a)(2) Base Offense Level | 12 |
| (b)(1) Multiple Bribes | +2 |
| (b)(2) Value of unlawful payment is greater than $250,000,000 but not greater than $550,000,000 | +28 |
| (b)(3) Public official in a high-level decision-making position | +4 |
| **TOTAL** | 46 |

      c.      <u>Base Fine</u>.  Based upon USSG §§ 8C2.4(b) and § 2C1.1(d)(1)(A) the base

fine is $420,825,848 (because the value of the unlawful payment exceeds the fine indicated in

the Offense Level Fine Table, namely $150,000,000).

      d.      <u>Culpability Score</u>. Based upon USSG § 8C2.5, the culpability score is 8,

calculated as follows:

| | |
|---|---|
| (a)    Base Culpability Score | 5 |
| (b)(1) the organization had 5,000 or more employees and an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | +5 |
| (g)    The organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | -2 |
| **TOTAL** | 8 |

<u>Calculation of Fine Range</u>

| | |
|---|---|
| Base Fine | $420,825,848 |
| Multipliers | 1.60(min)/3.20(max) |

Fine Range                                                    $673,321,357/
                                                              $1,346,642,714

The Company agrees to pay total monetary penalties in the amount of $850,000,000 (the "Total

Criminal Penalty"), $40,000,000 of which will be paid as forfeiture by the Company on behalf of

KOLORIT, and $500,000 of which will be paid as a criminal fine by the Company on behalf of

KOLORIT, as part of its guilty plea.  The Total Criminal Penalty will be offset by up to

$100,000,000 for any civil penalties paid by the Company to the SEC in connection with this

matter.  Should any amount of such payment to the SEC be returned to the Company or any

affiliated entity for any reason, the remaining balance of the Total Criminal Penalty will be paid

to the U.S. Treasury within ten business days of such event.  The Company will pay

$750,000,000 of the Total Criminal Penalty to the United States Treasury within ten business

days of the sentencing hearing by the Court of MTS's subsidiary KOLORIT in connection with

its guilty plea and plea agreement entered into simultaneously herewith, except that the parties

agree that any criminal penalties that might be imposed by the Court on MTS's subsidiary

KOLORIT in connection with its guilty plea and plea agreement, including the contemplated

$40,000,000 in forfeiture and $500,000 fine, will be deducted from the $750,000,000.  The

Company, the Fraud Section and the Office agree that this penalty is appropriate given the facts

and circumstances of this case, including the Relevant Considerations described in Paragraph 4

of this Agreement.  The Total Criminal Penalty is final and shall not be refunded.  Furthermore,

nothing in this Agreement shall be deemed an agreement by the Fraud Section and the Office that

$850,000,000 is the maximum penalty that may be imposed in any future prosecution, and the

Fraud Section and the Office are not precluded from arguing in any future prosecution that the

Court should impose a higher fine, although the Fraud Section and the Office agree that under

those circumstances, it will recommend to the Court that any amount paid under this Agreement

should be offset against any fine the Court imposes as part of a future judgment. The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of the Total Criminal Penalty.  The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty or disgorgement amounts that the Company pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts.

### Conditional Release from Liability

e.      Subject to Paragraphs 16-18, the Fraud Section and the Office agree, except as provided in this Agreement and in the plea agreement between the Fraud Section and the Office and KOLORIT, dated February 22, 2019, that they will not bring any criminal or civil case against the Company relating to any of the conduct described in the attached Statement of Facts or the criminal Information filed pursuant to this Agreement.  The Fraud Section and the Office, however, may use any information related to the conduct described in the attached Statement of Facts against the Company:  (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

f.      This Agreement does not provide any protection against prosecution for any future conduct by the Company.

g.      In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

## Corporate Compliance Program

8.     The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws throughout its operations, including those of its controlled affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption, including, but not limited to, the minimum elements set forth in Attachment C.

9.     In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal accounting controls, policies, and procedures regarding compliance with the FCPA and other applicable anti-corruption laws. Where necessary and appropriate, the Company agrees to continue to enhance its compliance program  including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws.  The compliance program, including the internal accounting controls system will include, but not be limited to, the minimum elements set forth in Attachment C.  In assessing the company's compliance program, the Fraud Section and the Office, in their sole discretion, may consider the Monitor's certification decision.

**Independent Compliance Monitor**

10.     Promptly after the Fraud Section and the Office's selection pursuant to Paragraph 12 below, the Company agrees to retain a Monitor for the term specified in Paragraph 13.  The Monitor's duties and authority, and the obligations of the Company with respect to the Monitor and the Fraud Section and the Office, are set forth in Attachment D, which is incorporated by reference into this Agreement.  Within thirty (30) calendar days after the execution of this Agreement, the Company will propose to the Fraud Section and the Office a pool of three qualified candidates to serve as the Monitor.  The Monitor candidates or their team members shall have, at a minimum, the following qualifications:

        a.     demonstrated expertise with respect to the FCPA and other applicable anti-corruption laws, including experience counseling on FCPA issues;

        b.     experience designing and/or reviewing corporate compliance policies, procedure and internal controls, including FCPA and anti-corruption policies, procedures and internal controls;

        c.     the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement; and

        d.     sufficient independence from the Company to ensure effective and impartial performance of the Monitor's duties as described in the Agreement.

11.     The Fraud Section and the Office retain the right, in their sole discretion, to choose the Monitor from among the candidates proposed by the Company, though the Company may express its preference(s) among the candidates.  Monitor selections shall be made in keeping with the Department's commitment to diversity and inclusion.  If the Fraud Section and the Office determine, in their sole discretion, that any of the candidates are not, in fact, qualified

to serve as the Monitor, or if the Fraud Section and the Office, in their sole discretion, are not satisfied with the candidates proposed, the Fraud Section and the Office reserve the right to request that the Company nominate additional candidates.  In the event the Fraud Section and the Office reject any proposed Monitors, the Company shall propose additional candidates within twenty business days after receiving notice of the rejection so that three qualified candidates are proposed.  This process shall continue until a Monitor acceptable to both parties is chosen.  The Fraud Section and the Office and the Company will use their best efforts to complete the selection process within ninety calendar days of the execution of this Agreement.  If the Monitor resigns or is otherwise unable to fulfill his or her obligations as set out herein and in Attachment D, the Company shall within twenty business days recommend a pool of three qualified Monitor candidates from which the Fraud Section and the Office will choose a replacement.

12.     The Monitor's term shall be three years from the date on which the Monitor is retained by the Company, subject to extension or early termination as described in Paragraph 3. The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Attachment D.  The Company agrees that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires.  Nor will the Company discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Monitor's term.

## Deferred Prosecution

13.     In consideration of the undertakings agreed to by the Company herein, the Fraud Section and the Office agree that any prosecution of the Company for the conduct set forth in the attached Statement of Facts be and hereby is deferred for the Term, except as provided in the

14

plea agreement between the Fraud Section and the Office and KOLORIT, dated February 22, 2019.  To the extent there is conduct disclosed by the Company that is not set forth in the attached Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

14.     The Fraud Section and the Office further agree that if the Company fully complies with all of its obligations under this Agreement, the Fraud Section and the Office will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Within six months after the Agreement's expiration, the  Fraud Section and the Office shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agree not to file charges in the future against the Company based on the conduct described in this Agreement and the attached Statement of Facts.

## Breach of the Agreement

15.     If, during the Term, the Company (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to meet the cooperation and disclosure obligations set forth in Paragraphs 5 and 6 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 9 and 10 of this Agreement and Attachment C; (e) commits any acts that, had they occurred within the jurisdictional reach of the FCPA, would be a violation of the FCPA; or (f) otherwise fails to completely perform or fulfill each of the Company's obligations under the Agreement, regardless of whether the Fraud Section and the Office become aware of such a breach after the Term is complete, the Company shall thereafter be subject to prosecution for any federal

criminal violation of which the Fraud Section and the Office have knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Fraud Section and the Office in the U.S. District Court for the Southern District of New York or any other appropriate venue.  Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Fraud Section and the Office's sole discretion.  Any such prosecution may be premised on information provided by the Company or its personnel.  Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.  In addition, the Company agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section and the Office are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

16.     In the event the Fraud Section and the Office determine that the Company has breached this Agreement, the Fraud Section and the Office agree to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Company shall have the opportunity to respond

to the Fraud Section and the Office in writing to explain the nature and circumstances of such breach, including whether the breach is material to the Company's operations, as well as the actions the Company has taken to address and remediate the situation, which explanation the Fraud Section and the Office shall consider in determining whether to pursue prosecution of the Company.

17.     In the event that the Fraud Section and the Office determine that the Company has breached this Agreement:  (a) all statements made by or on behalf of the Company to the Fraud Section and the Office or to the Court, including the attached Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section and the Office against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer, or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section and the Office.

18.     The Company acknowledges that the Fraud Section and the Office have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment. The Company

17

further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

19.     On the date that the period of deferred prosecution specified in this Agreement expires, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will certify to the Fraud Section and the Office that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement.  Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

**Sale, Merger, or Other Change in Corporate Form of Company**

20.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term of the Agreement, the Company sells, merges, or transfers all or substantially all of its business operations, or all or substantially all of the business operations of its subsidiaries involved in the conduct described in the attached Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include, as determined in the sole discretion of the Fraud Section and the Office (considering all relevant factors related to the transaction and the Agreement), in any contract for such sale, merger, transfer, or other change in corporate form provisions to bind the purchaser, or any successor in interest thereto, to any or all obligations described in this Agreement.  The Company shall provide notice to the Fraud Section and the Office at least thirty days prior to undertaking any such sale, merger, transfer, or other change in corporate form in order to give the Fraud Section and the Office an opportunity to determine if such change in corporate form

would impact the terms or obligations of the Agreement.

21.     Except as may otherwise be agreed by the parties hereto in connection with a particular transaction, if, during the Term of the Agreement, the Company undertakes any change in corporate form that involves the sale, asset sale or other disposition of business operations that are material to the consolidated financial statements of the Company as a whole, or to the financial statements of its subsidiaries involved in the conduct described in the attached Statement of Facts, as they exist as of the date of this Agreement, whether such transaction is structured as a sale, asset sale, merger, transfer, or other similar transaction, the Company shall provide notice to the Fraud Section and the Office at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form in order to give the Fraud Section and the Office an opportunity to determine if such change in corporate form would impact the terms or obligations of the Agreement.  If the sale, merger, transfer, or other change in corporate form is first considered by the Company less than thirty (30) days prior to such transaction, the Company will provide notice to the Fraud Section and the Office no later than seven days after the date such transaction is first considered and in any event no less than seven days before the transaction is completed.  If such transaction (or series of transactions) is completed and has the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined in the sole discretion of the Fraud Section and the Office (considering all relevant factors related to the transaction and the Agreement), it shall be deemed a breach of this Agreement subject to Paragraphs 16-18 of this Agreement.

### Public Statements by Company

22.     The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the

Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of Facts.  Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 16-18 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the attached Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Fraud Section and the Office.  If the Fraud Section and the Office determine that a public statement by any such person contradicts in whole or in part a statement contained in the attached Statement of Facts, the Fraud Section and the Office shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification.  The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the attached Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the attached Statement of Facts.  This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

23.     The Company agrees that if it or any of its direct or indirect subsidiaries or controlled affiliates issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Fraud Section and the Office to determine (a) whether the text of the release or proposed statements at the press conference are true and

accurate with respect to matters between the Fraud Section and the Office and the Company; and (b) whether the Fraud Section and the Office has any objection to the release or statement.

24.     The Fraud Section and the Office agree, if requested to do so by the Company, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation.  By agreeing to provide this information to such authorities, the Fraud Section and the Office is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

### Limitations on Binding Effect of Agreement

25.     This Agreement is binding on the Company and the Fraud Section and the Office but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Fraud Section and the Office will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

### Notice

26.     Any notice to the Fraud Section and the Office under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Chief, FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Ave, NW, 11th Floor, Washington, DC 20005 and Chief, Criminal Division, United States Attorney's Office for the Southern District of New York, 1 St. Andrew's Plaza New York City, NY 10007.  Any notice to the Company under this Agreement

shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Andrey Kamensky (or his successor), Chief Financial Officer, Mobile TeleSystems PJSC, 5 Vorontsovskaya Street, bldg. 2, 109147 Moscow Russian Federation and Gary DiBianco, Skadden, Arps, Slate, Meagher & Flom LLP, 1440 New York Ave, NW, Washington, DC 20005.  Notice shall be effective upon actual receipt by the Fraud Section and the Office or the Company.

## **Complete Agreement**

27.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and the Fraud Section and the Office. No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the Fraud Section and the Office, the attorneys for the Company, and a duly authorized representative of the Company.

AGREED:
**FOR MOBILE TELESYSTEMS PJSC**

Date: ~~February February 2019~~    By: _____

Andrey Kamensky
Chief Financial Officer
Mobile TeleSystems PJSC

Date: _February 22, 2019_    By: _____

Gary DiBianco
Mitchell Ettinger
Kara Roseen
Skadden, Arps, Slate, Meagher & Flom LLP

Lanny Breuer
Benjamin Haley
Covington & Burling LLP

Counsel to Mobile TeleSystems PJSC

**FOR THE DEPARTMENT OF JUSTICE:**

ROBERT A. ZINK
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

Date: _February 28, 2019_    By: _____

Nicola J. Mrazek
Senior Litigation Counsel

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

Date: _2/28/19_    By: _____

Edward Imperatore
Assistant United States Attorney

By: _____

Robert Khuzami
Deputy U.S. Attorney

23

**COMPANY OFFICER'S CERTIFICATE**

I have read this Agreement and carefully reviewed every part of it with outside counsel for Mobile TeleSystems PJSC (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the United States Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company. I have advised and caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Chief Financial Officer for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: _22 February 2019_

Mobile TeleSystems PJSC

By: _____

Andrey Kamensky
Chief Financial Officer

24

## <u>CERTIFICATE OF COUNSEL</u>

I am counsel for Mobile TeleSystems PJSC (the "Company") in the matter covered by this Agreement.  In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company Board of Directors.  Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and Andrey Kamensky, the Chief Financial Officer of the Company.  I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement.  To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: February 22, 2019

By: _____
Gary DiBianco
Skadden, Arps, Slate, Meagher & Flom LLP

Lanny Breuer
Covington & Burling LLP

Counsel to Mobile TeleSystems PJSC

**ATTACHMENT A**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Deferred

Prosecution Agreement (the "Agreement") between the United States Department of Justice,

Criminal Division, Fraud Section and the United States Attorney's Office for the Southern

District of New York (collectively, the "Fraud Section and the Office") and Mobile TeleSystems

PJSC (previously Mobile TeleSystems OJSC, "MTS" or the "Company").  MTS admits, accepts,

and acknowledges that it is responsible for the acts of its officers, directors, employees, and

agents as set forth below.  Should the Fraud Section and the Office pursue the prosecution that is

deferred by this Agreement, MTS agrees that it will neither contest the admissibility of, nor

contradict, this Statement of Facts in any such proceeding.  The following facts took place during

the relevant time frame and establish beyond a reasonable doubt the charges set forth in the

Criminal Information attached to this Agreement.

**I. Introduction**

**A.     The Uzbek Regulatory Regime for Telecommunications**

1.     The Uzbek Agency for Communications and Information ("UzACI") was an

Uzbek governmental entity authorized to regulate operations and formulate state policy

regarding communications, information technology, and the use of radio spectrum in Uzbekistan.

As such, UzACI was a "department," "agency," and "instrumentality" of a foreign government,

as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States

Code, Sections 78dd-1(f)(1).

**B.      MTS and Other Relevant Entities and Individuals**

2.      During the relevant time period of 2004 through 2012, MTS was a multinational telecommunications company headquartered and incorporated in Russia.  MTS maintained a class of securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, *see* Title 15, United States Code, Section 78*l*, and was required to file periodic reports with the U.S. Securities and Exchange Commission ("SEC") under Section 15(d) of the Securities Exchange Act, *see* Title 15, United States Code, Section 78o(d).  Accordingly, during the relevant time period, MTS was an "issuer" as that term is used in the FCPA.  MTS had subsidiaries and engaged in joint ventures in various countries in the territory of the former Soviet Union through which it conducted telecommunications business. During the relevant time period, MTS employed between 23,000 and 62,000 people.

3.      In or around 2004, MTS began operating its mobile telecommunications business in Uzbekistan through its subsidiary Uzdunrobita LLC ("Uzdunrobita"), which was headquartered and organized in Uzbekistan.

4.      From in and around 2004 to 2012, MTS held between 74% and 100% of the shares of Uzdunrobita.  MTS acquired its ownership interest in Uzdunrobita, in part, from the purchase of all shares held in Uzdunrobita by an American Company ("American Company"), whose identity is known to the United States.  American Company was incorporated and headquartered in the state of Georgia.

5.      "Executive 1," an individual whose identity is known to the United States, was a high-ranking executive of MTS who had authority over MTS's foreign subsidiaries from 2007 to 2013.

A-2

6.      "Executive 2," an individual whose identity is known to the United States, was a high-ranking executive of Uzdunrobita from 2002 to 2012.  From 2007 to 2012, Executive 2 reported to Executive 1.

7.      "Foreign Official," an individual whose identity is known to the United States, was a relative of a high-ranking Uzbek government official and an Uzbek government official, including Uzbek Deputy Minister of Foreign Affairs for Cultural Issues and Uzbekistan's Ambassador to the United Nations.  Foreign Official had influence over decisions made by UzACI.  Foreign Official was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A).  Executive 2 acted as an "agent" of Foreign Official as that term is used in U.S. law.

8.      "Shell Company A" was a company incorporated in Gibraltar that was beneficially owned by Foreign Official.

9.      "Associate A," an individual whose identity is known to the United States, was Foreign Official's close associate and was the purported sole owner and director of Shell Company A.

10.      "Shell Company B" was a company incorporated in Gibraltar that was beneficially owned by Foreign Official.

11.      "Associate B," an individual whose identity is known to the United States, was Foreign Official's close associate. When Shell Company B was incorporated in 2004, Associate B was approximately 20 years old and was Shell Company B's purported sole owner and director.

12.      KOLORIT DIZAYN INK Limited Liability Company ("KOLORIT") was an advertising company organized under the laws of Uzbekistan.  In 2009, Uzdunrobita acquired

KOLORIT.  As described further below, Foreign Official was an ultimate beneficiary of that transaction.

## II. Overview of the Corruption Scheme

13.     From 2004 to 2012, MTS, Uzdunrobita, Executive 1, and Executive 2 conspired with others to pay bribes in violation of U.S. law totaling at least $420,825,848 for the benefit of Foreign Official in order to enter and continue to operate in the Uzbek telecommunications market.  Executive 1 and certain other management and employees of MTS and affiliated entities and Executive 2 and certain management and employees of Uzdunrobita (hereinafter referred to singularly and collectively as "certain MTS management") understood that they had to regularly make payments to benefit Foreign Official in order to continue to do business in Uzbekistan.  During the scheme, conspirators, including Associate A, Associate B, and certain MTS management, used U.S.-based email accounts to communicate with each other and other individuals about the scheme.  In addition, MTS and Uzdunrobita made and caused to be made numerous corrupt payments that were routed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.  More specifically:

a.      In or around the summer of 2004, MTS acquired 74% of Uzdunrobita by purchasing a 41% stake from American Company and a 33% stake from Shell Company A.  At the time of the acquisition, MTS knew that Shell Company A was beneficially owned by Foreign Official.  MTS paid Shell Company A for Foreign Official's benefit approximately $100 million for a 33% stake in Uzdunrobita, which represented a price of six times more per share than MTS paid for American Company's 41% stake.  At least a portion of the payment to Shell Company A was made in exchange for Uzdunrobita's ability to operate in Uzbekistan.  Shell Company A retained 26% of Uzdunrobita.  MTS and Shell Company A agreed that either could exercise an

option to buy or sell this remaining stake for approximately $37.7 million, plus interest, in three years.

      b.    In or around 2006, at Foreign Official's demand, MTS and Shell Company A agreed to amend the option agreement.  Instead of having a fixed price for the remaining stake in Uzdunrobita, MTS and Shell Company A agreed that the option would be priced at market value.  The amendment was made for the benefit of Foreign Official in exchange for allowing Uzdunrobita to continue to operate in Uzbekistan.  In or around 2007, Shell Company A exercised its option to sell its remaining stake in Uzdunrobita, and MTS paid Shell Company A approximately $250 million, resulting in Foreign Official receiving a much higher purchase price than contemplated under the original option agreement.

      c.    In or around 2008, MTS and Shell Company B entered into an agreement in which MTS agreed to pay $30 million to Shell Company B for Foreign Official's benefit in exchange for Shell Company B's subsidiary repudiating various telecommunications frequencies and the reassignment of those frequencies by UzACI to Uzdunrobita.  MTS paid that amount to Shell Company B for Foreign Official's benefit to obtain the frequencies and to continue to operate in Uzbekistan.

      d.    In or around 2009, MTS and Uzdunrobita acquired KOLORIT, an Uzbek advertising company. Certain MTS management knew that the price paid by MTS for KOLORIT was inflated to $39.6 million in order to compensate Foreign Official in exchange for Uzdunrobita continuing to operate in Uzbekistan.

      e.    In or around 2012, Uzdunrobita paid approximately $1.1 million in bribes in violation of U.S. law to entities related to Foreign Official for purported charities or sponsorships.

14.    The last corrupt payment in violation of U.S. law for the benefit of Foreign Official was made no later than May 2012.  After that time, MTS and Uzdunrobita did not satisfy Foreign Official's demands for additional payments.  In retaliation, Foreign Official used her influence with the Uzbek government to expropriate Uzdunrobita.

### III.  The Corruption Scheme

**A.    MTS Corruptly Acquires Uzdunrobita in 2004**

15.    In or around 2004, MTS sought to enter the Uzbek telecommunications market by acquiring Uzdunrobita.  MTS paid a portion of the purchase price of Uzdunrobita to Shell Company A for the benefit of Foreign Official.

16.    Certain MTS management knew that Uzdunrobita's majority shareholder at that time, Shell Company A, was beneficially owned by Foreign Official, who also served as the Chairman of Uzdunrobita during two 2004 shareholder's meetings.  On or about July 14, 2004, MTS executed a share purchase agreement with Shell Company A under which MTS agreed to pay Shell Company A $100 million in exchange for a 33% stake in Uzdunrobita.  On or about the same day, MTS and Shell Company A executed a Put and Call Option Agreement (the "Option Agreement") under which MTS had the option to buy, and Shell Company A had the option to sell, Shell Company A's remaining 26% interest in Uzdunrobita for $37.7 million plus interest during the next three years.  On or about July 15, 2004, MTS executed a separate share purchase agreement with American Company, under which MTS agreed to pay American Company $21 million for a 41% stake in Uzdunrobita.  These agreements falsely stated that the transactions had been "duly and validly authorized by all required action" by MTS, when, in fact, MTS's Board of Directors did not approve the transactions until on or about July 26, 2004.

17.     Pursuant to these agreements, MTS paid Shell Company A approximately six times as much per share of Uzdunrobita as it paid to American Company.   MTS paid the extra amount to Shell Company A in exchange for Uzdunrobita's ability to operate in Uzbekistan.

18.     In or around March 2004, MTS had estimated Uzdunrobita to be valued at approximately $57.8 to $73.9 million.  However, four months later in or around July 2004—at the time of MTS's acquisition of Uzdunrobita—MTS documents listed Uzdunrobita's value as between $138.6 and $188.4 million.

19.     On or about July 29, 2004, MTS transferred approximately $100 million to an escrow account for the benefit of Shell Company A in the United Kingdom.  On or about August 2, 2004, certain MTS management, including Executive 2, executives from American Company, Foreign Official, and others attended the deal closing ceremony for MTS's acquisition of Uzdunrobita.  Foreign Official presided over the meeting as Chairman of Uzdunrobita and signed the meeting minutes.  On or about August 9, 2004, the escrow agent for the United Kingdom account transferred approximately $100 million to Shell Company A's bank account in Latvia through correspondent bank accounts at financial institutions in New York, New York.

B.     **$250 Million Corrupt Payment Through Shell Company A in 2007**

20.     In or around August 2006, at the demand of Foreign Official, certain MTS management and Foreign Official, through Executive 2, negotiated an amendment to the Option Agreement that served to increase the purchase price for Shell Company A's remaining stake in Uzdunrobita.  The amendment benefited Foreign Official by eliminating MTS's call option, extending the time period for Shell Company A's put option, and removing the fixed exercise price of $37.7 million plus interest.  The amended agreement instead allowed the value of the shares to be determined by an international investment bank selected by the parties.  Given that

Uzdunrobita's value had increased significantly from 2004, in part due to Foreign Official's influence, certain MTS management understood that the amended option agreement conferred a significant pecuniary benefit for Foreign Official.

21.     On or about August 15, 2006, Associate A signed a resolution allowing Shell Company A to approve the amendment of the Option Agreement.  On or about August 17, 2006, MTS and Shell Company A entered into a new agreement that amended the terms of the Option Agreement (the "Amended Option Agreement").  Certain MTS management did not obtain the approval of MTS's Investment Committee or MTS's Board of Directors for the amendment and only informed MTS's Investment Committee after the amendment agreement had been executed.

22.     After the Amended Option Agreement was entered into, but before the option was executed, a new MTS executive learned of the relationship between MTS and Shell Company A. In or around February 2007, the new executive began to raise concerns, including the FCPA risk MTS faced if Shell Company A was, in fact, beneficially owned by Foreign Official.

23.     On or about February 7, 2007, the new executive emailed certain MTS management concerning the risk of doing business with Shell Company A because "in the open sources, there are speculations as to the connections of this company and the current [Uzbek] regime."  The new executive called for a "confidential investigation of the beneficiary owners" of Shell Company A.

24.     On or about February 12, 2007, the new executive emailed certain members of MTS's management concerning new information the new executive had learned through an investigation of public sources and the new executive's consequent heightened concerns.  The new executive explained, "[w]e need to ensure, by obtaining a third party opinion . . . that Shell Company A and its beneficiaries and officers do not have any connections to [a high-ranking

Uzbek government official's] family or to government officials of Uzbekistan."  The new executive continued, "We need to re-check the previous transaction for acquisition of Uzdunrobita to make sure there are no risks of potential persecution for the purchase of shares from [Foreign Official] (if they were actually purchased from [Foreign Official])."  The new executive emphasized, "From the reputational point of view, we should exclude any association between MTS and [Foreign Official] – [a] profile is attached."

25.      The new executive attached to the February 12, 2007 email a series of articles about Foreign Official from internet sources, which included that: Foreign Official had set up Shell Company A, which "received" 20% of Uzdunrobita from American Company and 31.4% from the Uzbek government; Foreign Official had an official role in the Uzbek government and influence with a high-ranking Uzbek government officials; Foreign Official had amassed a "large business empire" through "corrupt means" and that part of Foreign Official's holdings was "the largest wireless telephone operator in Uzbekistan," which, at the time, was Uzdunrobita; and Foreign Official had substantial influence in the Uzbek government, including in the telecommunications sector.

26.      In addition to the articles above, the new executive also attached a memo to his February 12, 2007 email, which stated that MTS faced FCPA risks because "[i]n public sources, including transcripts of court proceedings, it was stated that in 2004, [MTS] acquired a majority stake in 'Uzdunrobita' in the transaction, where one of the selling shareholders was [Foreign Official]."  The memo further noted that the high-ranking Uzbek government official related to Foreign Official "held office at the time of the transaction."  The memo ended with a list of risks that included, "1) Reputational risk — [Foreign Official]," "2) FCPA risk," and "3) the risk of a regime change and of the revision of the privatization/acquisition of licenses."

27.    In response to the new executive's emails, certain MTS management took steps to restrict further dissemination of the new executive's concerns about the Foreign Official.

28.    Because the new executive insisted that MTS conduct additional due diligence, MTS hired a U.S. law firm to conduct due diligence on Shell Company A.  In an effort to ensure that the legal opinion would be favorable, certain MTS management did not disclose certain relevant information to the law firm, including the crucial fact that certain MTS management knew that Foreign Official was the beneficial owner of Shell Company A.

29.    On or about April 2, 2007, in part due to Foreign Official's influence, UzACI granted Uzdunrobita licenses for additional frequencies.

30.    On or about April 12, 2007, Shell Company A sent notice to MTS of its intention to exercise its put option under the Amended Option Agreement.  On or about April 27, 2007, MTS and Shell Company A jointly engaged an investment bank to value Shell Company A's remaining interest in Uzdunrobita.  The bank estimated that 26% of Uzdunrobita was worth approximately $250 million, including 26% of the value of the additional licenses.

31.    On or about May 25, 2007, certain MTS management circulated a presentation about MTS's negotiating position regarding the deal, including expressing concern that Foreign Official would expect that the entire value of the licenses would be added to the price for 26% of Uzdunrobita's shares, ultimately demanding a payment of $375 million.  The presentation noted that MTS would be "deprived of protection from [the] consequences of loss of partner [*i.e.*, Foreign Official]."

32.     On or about June 26, 2007, MTS's Board of Directors approved the $250 million payment to Shell Company A.   On or about June 28, 2007, MTS transferred approximately $250

million to Shell Company A's bank account in Hong Kong, via wire transfers through correspondent bank accounts at financial institutions in New York, New York.

33.     During this time period, Foreign Official was also utilizing Executive 2 to negotiate similar bribe payments from MTS's and Uzdunrobita's competitors, Unitel and Coscom, as also admitted by Unitel and Coscom.  Specifically, Executive 2 helped Foreign Official obtain a 26% ownership interest in both Unitel and Coscom, through Shell Company A, with the knowledge of certain MTS management.  Certain MTS management permitted Executive 2 to assist its competitors because it understood that doing so would allow MTS to continue to do business in the Uzbek telecommunications sector.

**C.     Corrupt Payment of $30 Million through Shell Company B in 2008-2009**

34.     On or about April 15, 2008, Executive 2 emailed Executive 1 concerning a letter from UzACI.  Attached to the email was a notice from UzACI concerning purportedly bad connection quality for local and inter-city calling in violation of Uzdunrobita's license.  The notice stated that if those violations were not corrected within one month, Uzdunrobita's license could be suspended or revoked.  Later that day, Executive 1 forwarded the email to certain MTS management, stating that Executive 2 "had warned us that [Foreign Official] will be taking revenge" for MTS's decision to decline to engage in another transaction for the benefit of Foreign Official.

35.     On or about April 15, 2008, Executive 2 forwarded Executive 1 another adverse letter from an Uzbek state-owned entity. Executive 1 forwarded the letter to certain MTS management stating, "Continuation of the pressure."

36.     During the summer of 2008, certain MTS management continued to discuss how to address Foreign Official's demands for additional improper payments.  On or about July 3,

2008, Executive 1 emailed certain MTS management a list of the "Problems in Uzbekistan." The list included official currency conversion, "[p]eriodic (initiated by the [Foreign Official] or by [Executive 2]) claims of the [telecom] regulator . . . ," and Executive 2's "participation in [C]oscom Company [a competitor of Uzdunrobita] management (more than 30% belong to [Foreign Official]."). Executive 1 noted several problems, including Executive 2's "connections in the state authorities under [Foreign Official's] auspices" and that the frequencies that Foreign Official was offering lacked "legal 'cleanliness'" because they "were taken away illegally." In offering solutions, Executive 1 suggested "direct bargaining with [Foreign Official]" for telecommunications licenses, construction and operation permits, and currency conversion and that there be an "amount of annual subscription fee for 'happiness,' but under our management." To accomplish this, Executive 1 suggested a "direct meeting with [Foreign Official] and [a high-ranking MTS executive]" without Executive 2's "knowledge and participation."

37. On or about July 20, 2008, Executive 1 emailed certain MTS management asking for input on an attached memo. The memo explained that "[t]he Third Party [Foreign Official] is making a demand that [MTS] pay $50 mln . . ." The memo cautioned, however, that "outright rejection of the payments" or replacement of Uzdunrobita's management could lead to potential consequences, including "the Third Party [*i.e.*, Foreign Official] creating difficulties (of various kinds)" for Uzdunrobita's business, "suspension" of Uzdunrobita's operations, or the forced sale of Uzdunrobita. Executive 1 noted that there were not "available legal options" to "provide reliable protection from the Third Party [*i.e.*, Foreign Official]." The memo went on to explain that a "decision has been made to resume direct negotiations with the Third Party [*i.e.*, Foreign Official]" and discussed in detail possible payment methods for the benefit of Foreign Official

and various governmental benefits that MTS hoped it could obtain, including "expansion of existing licenses," currency conversion, and tax and customs benefits.

38.     Thereafter, an MTS foreign subsidiary entered into a contract with Shell Company B, whose beneficial owner certain MTS management knew was Foreign Official. Under the proposed contract, the foreign MTS subsidiary would pay Shell Company B approximately $30 million in exchange for Shell Company B's subsidiary repudiating various telecommunications frequencies and the reassignment of those frequencies by UzACI to Uzdunrobita.

39.     On or about August 19, 2008, certain MTS management sent a due diligence firm incorporation information about Shell Company B, including Associate B's name.

40.     Certain MTS management, however, did not provide the due diligence firm with certain relevant information concerning Shell Company B, including the crucial fact that certain MTS management knew that Foreign Official beneficially owned Shell Company B.

41.     One day later, on or about August 20, 2008, before the due diligence was completed on the transaction, Executive 2 emailed certain MTS management, including Executive 1, a copy of a finalized but undated agreement between an MTS foreign subsidiary and Shell Company B, signed by Associate B.   Executive 2 explained, "I need to get info from you about the date they shall be dated, because I should start processing tra[n]sfer of frequencies to Uzdunrobita […] today."  The executed agreement between an MTS foreign subsidiary and Shell Company B was dated August 21, 2008.  On or about August 28, 2008, certain MTS management, copying Executive 1, emailed the executed agreement with Shell Company B to Executive 2.

42.     In or around this time, certain MTS management discussed the need for Board of Directors approval of the loan between MTS and the MTS foreign subsidiary that would fund the agreement. On or about August 22, 2008, Executive 1 emailed certain MTS management that "[w]e will do a little work on the justification for the Board of Directors," and asked certain MTS management, "please come up with something non-traditional, deadline is Aug 29."

43.     On or about August 25, 2008, UzACI issued an order allocating the frequencies earlier repudiated by Shell Company B's subsidiary to Uzdunrobita.

44.     On or about August 29, 2008, an executive at the due diligence firm sent certain MTS management an email with a draft report on Shell Company B.   The email explained that although "some enquires remain outstanding, I hope the report contains the idea as to how the main angle – that is FCPA – is affected." The report referred to information that Shell Company B was "beneficially owned by the family of [a high-ranking Uzbek government official]," and that Associate B was "a trustee of [Foreign Official]" and worked for Foreign Official.   The report further documented international press articles that also reported that Shell Company B was beneficially owned by the family of a high-ranking Uzbek government official.  It also noted that Shell Company B was a minority owner of both of Uzdunrobita's competitors in Uzbekistan, Unitel and Coscom.

45.     Despite the issues raised in the due diligence report, MTS continued to execute the agreement with Shell Company B.  On or about September 4, 2008, the Board approved a funding mechanism in the form of a $30 million loan to the foreign subsidiary. The Board was advised only that the loan was "[f]or financing of operational activity and possible implementation of projects in the future."

46.     On or about September 5, 2008, MTS entered into a $30 million loan agreement
with its foreign subsidiary to fund the agreement between the MTS foreign subsidiary and Shell
Company B.

47.     On or about September 19, 2008, Executive 1 sent certain MTS management an
email with the subject "question re: U" with no content.  Attached to the email was a PowerPoint
slide listing the "Status of our requests" and the "Status of our commitments." The requests listed
were various governmental benefits, including currency conversion, tax benefits, and a bilateral
agreement with the Uzbek government on the protection of investments, noting that the requests
had been refused except that Foreign Official accepted "a request for conversion of $3 million
for the repayment of the Company's outstanding debts."  The slide identified MTS's
commitments as "a payment of the total amount of $50 million" and "[b]eginning in 2009, for
the assistance in creating favorable conditions for the growth of the Company and its subscriber
base, guarantee [of] the payment of an average of $20 million/year."  Beneath the $50 million
figure, the slide noted "$30 million through the purchase of [telecommunications] frequencies,
prior to 01/11/08" followed by "MTS is ready to make the payment immediately."

48.     On or about the following dates, MTS, or an MTS foreign subsidiary, made the
following payments to Shell Company B's bank accounts for Foreign Official's benefit, via wire
transfers through correspondent bank accounts at financial institutions in New York, New York.

| Date | Sender | Recipient | Recipient's Bank | Amount |
|------|--------|-----------|------------------|--------|
| October 21, 2008 | MTS | Shell Company B | Riga, Latvia | $5,000,000 |
| February 6, 2009 | MTS subsidiary | Shell Company B | Hong Kong | $5,000,000 |
| March 5, 2009 | MTS subsidiary | Shell Company B | Hong Kong | $5,000,000 |

A-15

| Date | Sender | Recipient | Recipient's Bank | Amount |
|---|---|---|---|---|
| April 28, 2009 | MTS subsidiary | Shell Company B | Hong Kong | $5,000,000 |
| June 17, 2009 | MTS subsidiary | Shell Company B | Hong Kong | $5,000,000 |
| July 14, 2009 | MTS | Shell Company B | Hong Kong | $5,000,000 |

49.     On or about November 2, 2009, Executive 1 emailed himself a presentation including an updated copy of the slide referenced in paragraph 47.   The updated version of the slide stated that MTS's obligations relating to a "[telecommunications] frequencies acquisition for $30 mln by 01.11.08" were "Paid in full in July 2009."

**D.     Corrupt Payment of $39.6 Million Through Acquisition of KOLORIT in 2009**

50.     As discussed in paragraph 37, on or about July 20, 2008, Executive 1 emailed certain MTS management a memo stating that "[t]he Third Party [Foreign Official] is making a demand that [MTS] pay $50 mln . . . ." "by acquiring an asset" whose value was "overstated," which was "unattractive" to MTS's "development strategy" and whose size would be "impossible to explain to the investment community."

51.     As discussed in paragraph 47, on or about September 19, 2008, Executive 1 sent certain MTS management a slide indicating a $50 million commitment to Foreign Official for various government benefits.  The slide showed that, after the $30 million for the agreement with Shell Company B was taken into account, the remaining balance was "$20 million." The slide also contemplated an additional "$20 million/year" for "assistance in creating favorable conditions for the growth of the company."  Both amounts were followed by the notations, "The basis for payment and the draft agreement are being worked out."  The slide noted that "no

scheme exists other than making the payment as a fee for services.  Proposing to increase the amount of the contract pertaining to [telecommunications frequencies], with delayed payments."

52.     On or about December 11, 2008, certain MTS management, including Executive 1, received a report about the possible acquisition of KOLORIT.  The report noted that KOLORIT was "connected to MTS by a long history of relations" and that it "was created by the same shareholders as Uzdunrobita before it."  Noting that MTS and KOLORIT had articulated reasons for the acquisition, the report stated that "[i]n my opinion, the main reason [for the acquisition] is the interest of the founders on the Uzbekistani side and certain internal agreements.  [KOLORIT] was created and developed exclusively as a result of activities of the founders of Uzdunrobita; a clear connection is maintained today as well."  The report further noted that "the reason for the sale of KOLORIT for [KOLORIT]'s ownership is unclear," that KOLORIT did not need the sale for its development, and that "maybe, there are hidden economic factors that will not be disclosed to an external expert."

53.     On or about April 9, 2009, certain MTS management wrote Executive 1, stating that the KOLORIT "transaction is a toxic one" and that "I think that we need to get the transaction to [MTS's Investment Committee].  Let [certain MTS management] and the [Investment Committee] members share liability."

54.     On or about July 28, 2009, certain MTS management emailed an executive at the same due diligence firm MTS had contracted with for due diligence on Shell Company B.  The email requested the firm "initiate as quickly as possible an FCPA investigation of the following companies that are participants in [KOLORIT]."  Certain MTS management, however, did not disclose certain relevant information to the due diligence firm, including the crucial fact that certain MTS management knew that Foreign Official would benefit from the transaction.

55.     On or about August 7, 2009, certain MTS management received a memo from MTS's Department of Strategic Planning for the August 10, 2009 MTS Investment Committee meeting, recommending rejection of the KOLORIT acquisition because the acquisition was not part of MTS's "core business" and the estimate for advertising market development was "not realistic."  The memo explained, "Within [the] framework of qualitative analysis, it's hard to imagine—within [the] framework of this poor country (171st rank in GDP – per capita (PPP) and 185th rank in inflation rate), just one outdoor local advertising company could cost 40 MUSD. This is a pure fairy tale!" Certain internal and external valuations of KOLORIT were significantly less than the recommended purchase price.

56.     On or about August 14, 2009, certain MTS management received a report from the due diligence firm explaining that Uzbek corporate records indicated that Associate B and another individual were the shareholders of KOLORIT.  The report further noted that Foreign Official and Associate B had various connections, but "[s]ources are unaware if [Associate B] represents the interests of [Foreign Official] at [KOLORIT]."  Although certain MTS management received the report, which stated that rumors that KOLORIT might be beneficially owned by Foreign Official were not considered credible, certain MTS management in fact knew that Foreign Official was the beneficial owner of KOLORIT.

57.     On or about September 16, 2009, Executive 1 presented the KOLORIT transaction to MTS's Board of Directors, which approved it.  The Board materials for the meeting included the inflated valuation for KOLORIT and did not disclose that Foreign Official would benefit from the transaction.

58.     On or about September 22, 2009, Uzdunrobita, through Executive 2, entered into share purchase agreements with the shareholders of KOLORIT.  On or about that same day,

September 22, 2009, Uzdunrobita, through Executive 2, and the shareholders of KOLORIT executed statements of transfer and acceptance of equity interest.

59.     On or about September 22, 2009, Uzdunrobita paid the shareholders of KOLORIT a total of approximately $39,636,711 equivalent in Uzbek som.

60.     On or about September 22, 2009, an MTS subsidiary entered into a share purchase agreement with a shareholder of KOLORIT, which was executed by certain MTS management.

61.     On or about September 29, 2009, an MTS subsidiary transferred $17,000 to the Uzbek account of a shareholder in Uzbekistan, through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

62.     As discussed in paragraph 49, on or about November 2, 2009, Executive 1 emailed himself a presentation including an updated copy of the slide referenced in paragraph 47. The slide stated that MTS's $50 million obligation had been "Paid in full in September 2009," including "through [KOLORIT] acquisition."  The presentation also proposed "[t]o tie strictly further execution of our obligations with the partner's [*i.e.,* Foreign Official] ones."  The presentation also noted problems with changing Uzdunrobita's management, specifically Executive 2, including that there was "[n]o full support from the country's political circles to the change of this kind yet unless the Partner [*i.e.*, Foreign Official] supports" and there would be "[n]o one able to deal with the acquired [KOLORIT]." It also noted that Uzdunrobita could lose its "existing currency exchange opportunities" and "the acquired frequencies," or even face the "[r]ecall of the license in some of the regions."

**E.   Corrupt Payment of $1.1 Million to Purported Charities and for Sponsorships in 2012**

63.   In or around 2012, Foreign Official requested Uzdunrobita pay bribes in violation of U.S. law to entities related to Foreign Official as purported charitable donations or sponsorship payments.  In response to these requests, between on or about March 27, 2012 and on or about May 21, 2012, Uzdunrobita paid the equivalent of approximately $1,139,137 in Uzbek som.

64.   On or about March 27, 2012, Uzdunrobita paid at least the equivalent of $1,084,892.87 in Uzbek som to entities related to Foreign Official.  The only basis for these payments was letters from entities related to Foreign Official that were sent to Uzdunrobita requesting contributions.

65.   On or about March 29, 2012, Executive 2 sent Executive 1 a memorandum asking for approval from Uzdunrobita's Supervisory Board for 2 billion Uzbek som ($1,084,892.87) for payment for purported "charitable assistance" to various entities related to Foreign Official.

66.   On or about April 24, 2012, Uzdunrobita sent a payment order to an entity related to Foreign Official for the equivalent of 100 million Uzbek som as a purported advance payment for sponsorship aid.

67.   On or about May 21, 2012, Uzdunrobita received an invoice and a work completion act from the same entity related to Foreign Official identified in Paragraph 66 for 100 million in Uzbek som for purported "[s]ponsor support and organization of the 10th anniversary event" of the entity.

68.   On or about June 27, 2012, Uzdunrobita's Supervisory Board retroactively approved the above purported charity payments, discussed above in paragraph 65.

A-20

69.     Uzdunrobita made the above payments in violation of internal procedures that required preapproval of payments of those amounts.

### G.  Uzbekistan Expropriates Most of Uzdunrobita's Assets in 2012

70.     In or around the first half of 2012, Foreign Official became increasingly dissatisfied with MTS, Uzdunrobita, and Executive 2 because Uzdunrobita did not pay additional bribes for the benefit of Foreign Official.  Consequently, Foreign Official began to threaten retaliation against the company.

71.     On or about May 25, 2012, Executive 1 emailed certain MTS management that Foreign Official believed that "[Executive 2] and the company stopped being loyal to [Foreign Official] to the end."  In or around June 2012, Associate B threatened to have Executive 2 and other Uzdunrobita executives arrested unless Foreign Official's bribe demands were met.  In response, Executive 2 fled Uzbekistan on or about June 6, 2012.

72.     Foreign Official's retaliation against MTS and Uzdunrobita continued.  On or about August 13, 2012, an Uzbek court granted UzACI's petition to withdraw all operating licenses from Uzdunrobita, which ended Uzdunrobita's ability to operate in the telecommunications sector in Uzbekistan.  On or about August 27, 2012, Uzdunrobita's appeal of the decision was denied.

73.     On or about August 29, 2012, MTS filed a Form 6-K with the SEC stating that it was taking a $579 million impairment charge of goodwill and assets in Uzbekistan as well as a $500 million provision for tax and anti-monopoly claims in Uzbekistan.

### IV. MTS's Failure to Implement and Enforce Adequate Internal Accounting Controls

74.     Throughout the relevant time period, because MTS failed to implement adequate internal accounting controls and failed to enforce the internal accounting controls it did have in place, it made the corrupt payments for the benefit of the Foreign Official.

75.      MTS's lax internal control environment included a failure to require approval for certain transactions and a failure to comply with the established management approval requirements with respect to other transactions.  The 2006 option amendment never was approved by MTS's Board of Directors.  MTS's 2008 loan agreement with its foreign subsidiary to fund the payments to Shell Company B was approved by MTS's Board of Directors after the agreement with Shell Company B had been executed.  And Uzdunrobita made the purported sponsorship and charity payments without approval of the Uzdunrobita Supervisory Board, which Uzdunrobita's internal procedures required.

76.     MTS had inadequate disclosure controls and failed to follow established corporate governance procedures with respect to certain public statements made during the relevant period. For example, on or about June 13, 2012, a letter was sent from MTS addressed to the Prosecutor General's Office in Uzbekistan that stated that Executive 2 had made "inappropriate expenditures and plunder[ed] the property belonging to the Company."  The letter further stated that MTS wished to "restore the normal working order in the company," "rectify the faults" and "locate [Executive 2]," "including by seeking the assistance of INTERPOL."  On or about June 25, 2012, MTS contradicted and retracted the June 13, 2012 letter, asserting that it had been "provided by [a] mistake caused by a technical malfunction and failure in the internal document workflow," when in fact there was no technical malfunction.  Rather, MTS internal controls were

not adequate to prevent the letter from being issued without proper review and authorization from the appropriate MTS management.

77.     MTS also failed to follow established corporate governance protocols with respect to the role of the Board of Directors, including shareholder involvement, in certain aspects of its investment in Uzbekistan.  For example, during the first quarter of 2007, Uzdunrobita's management acquired a 1.5% interest in an Uzbek company without obtaining the approval of the MTS Board of Directors.  Similarly, as noted in paragraph 76, the June 13 and 25, 2012, letters were issued without the participation or knowledge of the Board of Directors.

78.     MTS failed to implement an adequate system for conducting, recording, and verifying due diligence on third parties to uncover their true nature, beneficial ownership, and possible corruption risks.  MTS lacked procedures for the management of due diligence results. As demonstrated above, certain MTS management withheld crucial information from outside counsel and due diligence professionals such that the advice given was without value.

79.     MTS also lacked adequate payment controls.  For example, it made payments from entities other than entities that had executed contracts and had no policy regarding payments to bank accounts located in places where the contractual partner neither performed work nor had operations.

80.     MTS also knowingly lacked a sufficient internal audit function to provide reasonable assurances that corporate assets were not used to pay bribes to foreign officials and failed to conduct adequate internal audits to detect and prevent criminal activity.

81.     MTS's failures to implement and enforce adequate internal controls contributed to an environment where it was possible for MTS and Uzdunrobita executives to make improper payments of over $420 million for the benefit of Foreign Official between 2004 and 2012.  MTS

also had particularly severe deficiencies in its general compliance function and its anticorruption

compliance policies and procedures.  Among other deficiencies, prior to mid-2012, MTS did not

have a Chief Compliance Officer or Compliance Department.

### V.  Falsification of Books and Records

82.     As a result of MTS's failure to implement effective internal accounting controls,

MTS, acting through its executives and others, disguised on its books and records over $420

million in bribe payments in violation of U.S. law made for the benefit of Foreign Official in

exchange for MTS's and Uzdunrobita's ability to enter and continue to operate in the Uzbek

telecommunications sector.

83.     In relation to the above-described payments, certain MTS management and others

used a variety of non-transparent transactions with different false purported business purposes,

described above, so that the payments would be inaccurately recorded in MTS's consolidated

books and records as legitimate transactions.

84.     The following payments were inaccurately recorded in MTS's consolidated books

and records:

a.     A payment on or about July 29, 2004 for approximately $100 million to an

escrow account for the benefit of Shell Company A in the United Kingdom.

b.     A payment on or about June 28, 2007 for approximately $250 million to

Shell Company A's bank account in Hong Kong.

c.     A payment on or about October 21, 2008 for approximately $5 million to

Shell Company B's bank account in Latvia.

d.     A payment on or about February 6, 2009 for approximately $5 million to

Shell Company B's bank account in Hong Kong.

e.      A payment on or about March 5, 2009 for approximately $5 million to Shell Company B's bank account in Hong Kong.

f.      A payment on or about April 28, 2009 for approximately $5 million to Shell Company B's bank account in Hong Kong.

g.      A payment on or about June 17, 2009 for approximately $5 million to Shell Company B's bank account in Hong Kong.

h.      A payment on or about July 14, 2009 for approximately $5 million to Shell Company B's bank account in Hong Kong.

i.      Payments on or about September 22, 2009 for a total of approximately $39,636,711 equivalent in Uzbek som to the shareholders of KOLORIT.

j.      A payment on or about September 29, 2009 for approximately $17,000 to a shareholder of KOLORIT's account in Uzbekistan.

k.      Payments between in or around March 27, 2012 and or about May 21, 2012 for a total of approximately $1,084,892.87 in Uzbek som to entities related to Foreign Official.

85.     MTS also created, and caused to be created, false records further to conceal these improper payments.  The bribe payments were concealed by fake contracts that were intended to create the appearance of legitimacy and were falsely described in Board materials.

**ATTACHMENT B**

**CERTIFICATE OF CORPORATE RESOLUTIONS**

WHEREAS, Mobile TeleSystems PJSC ("MTS" or the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section and the Office of the United States Attorney for the Southern District of New York (the "Fraud Section and the Office") regarding issues arising in relation to certain improper payments to foreign officials to facilitate the ability of the Company to enter and operate in the telecommunications market in Uzbekistan and accounting violations; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Fraud Section and the Office; and

WHEREAS, the Company's Chief Executive Officer, Alexey Kornya, together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Fraud Section and the Office;

Therefore, the Board of Directors has RESOLVED that:

1.      The Company (a) acknowledges the filing of the two-count Information charging the Company with one count of conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery and books and records provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, 78m(b)(2)(A), 78m(b)(5), and 78ff(a), and one count of violating the internal controls provisions of the of the FCPA, Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5), and 78ff(a); (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Fraud Section and Office; and

B-1

(c) agrees to accept a total criminal penalty against the Company totaling $850,000,000, and to pay such penalty with respect to the conduct described in the Information in the manner described in the Agreement;

2.      The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of New York; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution in the United States relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.      The Chief Financial Officer of the Company, Andrey Kamensky, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the Chief Financial Officer of Company, Andrey Kamensky, may approve;

4.      The Chief Financial Officer of the Company, Andrey Kamensky, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents

B-2

as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

     5.     Any of the actions of the Chief Financial Officer of the Company, Andrey Kamensky, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: _22 February 2019_

By: _____
Alexey Kornya
Chief Executive Officer
Mobile TeleSystems PJSC

**ATTACHMENT C**

**CORPORATE COMPLIANCE PROGRAM**

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.,* and other applicable anti-corruption laws, Mobile TeleSystems PJSC ("MTS" or the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws.  At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*High-Level Commitment*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-corruption laws and its compliance code.

*Policies and Procedures*

2.      The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA and other applicable foreign law counterparts (collectively, the "anti-corruption laws,"), which policy shall be memorialized in a written compliance code.

3.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Company.  These anti-corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners").  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.  Such policies and procedures shall address:

      a.      gifts;

      b.      hospitality, entertainment, and expenses;

      c.      customer travel;

      d.      political contributions;

      e.      charitable donations and sponsorships;

      f.      facilitation payments; and

C-2

g.      solicitation and extortion.

4.      The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts.  This system should be designed to provide reasonable assurances that:

a.      transactions are executed in accordance with management's general or specific authorization;

b.      transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

c.      access to assets is permitted only in accordance with management's general or specific authorization; and

d.      the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

*Periodic Risk-Based Review*

5.      The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery risks facing the Company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors of operation, involvement in joint venture arrangements, importance of licenses and permits in the Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

6.      The Company shall review its anti-corruption compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

### Proper Oversight and Independence

7.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-corruption compliance code, policies, and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

### Training and Guidance

8.      The Company will implement mechanisms designed to ensure that its anti-corruption compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a corruption risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements.

C-4

9.     The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-corruption compliance code, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

*Internal Reporting and Investigation*

10.     The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

11.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

*Enforcement and Discipline*

12.     The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's anti-corruption compliance code, policies, and procedures by the Company's directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or

perceived importance of, the director, officer, or employee.  The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

*Third-Party Relationships*

14.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

        a.      properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

        b.      informing agents and business partners of the Company's commitment to abiding by anti-corruption laws, and of the Company's anti-corruption compliance code, policies, and procedures; and

        c.      seeking a reciprocal commitment from agents and business partners.

15.     Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include:  (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Company's

C-6

compliance code, policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

16.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel.

17.     The Company will ensure that the Company's compliance code, policies, and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

         a.     train the directors, officers, employees, agents, and business partners consistent with Paragraph 8 above on the anti-corruption laws and the Company's compliance code, policies, and procedures regarding anti-corruption laws; and

         b.     where warranted, conduct an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable.

*Monitoring and Testing*

18.     The Company will conduct periodic reviews and testing of its anti-corruption compliance code, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's anti-corruption code, policies, and procedures, taking into account relevant developments in the field and evolving international and industry standards.

**ATTACHMENT D**

**INDEPENDENT COMPLIANCE MONITOR**

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of Mobile TeleSystems PJSC (the "Company"), on behalf of itself and its subsidiaries and controlled affiliates, with respect to the Monitor and the United States Department of Justice, Criminal Division, Fraud Section and the Office of the United States Attorney for the Southern District of New York (the "Fraud Section and the Office"), are as described below:

1.      The Company will retain the Monitor for a period of three years (the "Term of the Monitorship"), unless the early termination provision of Paragraph 3 of the Deferred Prosecution Agreement (the "Agreement") is triggered.

*Monitor's Mandate*

2.      The Monitor's primary responsibility is to assess and monitor the Company's compliance with the terms of the Agreement, including the Corporate Compliance Program in Attachment C, so as to specifically address and reduce the risk of any recurrence of the Company's misconduct.  During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the internal accounting controls, record-keeping, and financial reporting policies and procedures of the Company as they relate to the Company's current and ongoing compliance with the FCPA and other applicable anti-corruption laws (collectively, the "anti-corruption laws") and take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate").  This Mandate shall include an assessment of the Board of Directors' and senior management's commitment to, and effective

implementation of, the corporate compliance program described in Attachment C of the Agreement.

*Company's Obligations*

3.      The Company shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Company's compliance program in accordance with the principles set forth herein and applicable law, including applicable data privacy and national security laws and regulations.  To that end, the Company shall: facilitate the Monitor's access to the Company's documents and resources; not limit such access, except as provided in Paragraphs 5-6; and provide guidance on applicable local law (such as relevant data privacy and national security laws and regulations).  The Company shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement, subject to applicable local laws, including data privacy and national security laws and regulations.  The Company shall use its best efforts to provide the Monitor with access to the Company's former employees and its third-party vendors, agents, and consultants.

4.      Any disclosure by the Company to the Monitor concerning corrupt payments, false books and records, and internal accounting control failures shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the Fraud Section and the Office, pursuant to the Agreement.

*Withholding Access*

5.      The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor.  In the event that the Company seeks to withhold from the Monitor

D-2

access to information, documents, records, facilities, or current or former employees of the Company that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be inconsistent with applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6.      If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor and the Fraud Section and the Office.  Such notice shall include a general description of the nature of the information, documents, records, facilities or current or former employees that are being withheld, as well as the legal basis for withholding access.  The Fraud Section and the Office may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Monitor's Coordination with the*
*Company and Review Methodology*

7.      In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis.  The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (e.g., legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Company-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.      The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets.  In carrying out the Mandate, the Monitor should consider, for instance, risks

presented by: (a) the countries and industries in which the Company operates; (b) current and future business opportunities and transactions; (c) current and potential business partners, including third parties and joint ventures, and the business rationale for such relationships; (d) the Company's gifts, travel, and entertainment interactions with foreign officials; and (e) the Company's involvement with foreign officials, including the amount of foreign government regulation and oversight of the Company, such as licensing and permitting, and the Company's exposure to customs and immigration issues in conducting its business affairs.

9.      In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things:  (a) inspection of relevant documents, including the Company's current anti-corruption policies and procedures; (b) on-site observation of selected systems and procedures of the Company at sample sites, including internal accounting controls, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Company's compliance program.

*Monitor's Written Work Plans*

10.      To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial review and prepare an initial report, followed by at least two follow-up reviews and reports as described in Paragraphs 16-19 below.  With respect to the initial report, after consultation with the Company, the Fraud Section, and the Office, the Monitor shall prepare the first written work plan within sixty calendar days of being retained, and the Company and the Fraud Section and the Office shall provide comments within thirty calendar days after receipt of the written work plan.  With respect to each follow-up report, after consultation with the

Company and the Fraud Section and the Office, the Monitor shall prepare a written work plan at least thirty calendar days prior to commencing a review, and the Company and the Fraud Section and the Office shall provide comments within thirty calendar days after receipt of the written work plan.  Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the Fraud Section and the Office in their sole discretion.

11.     All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents.  The Monitor's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement.  In developing such understanding the Monitor is to rely to the extent possible on available information and documents provided by the Company.  It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*Initial Review*

12.     The initial review shall commence no later than one hundred twenty calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor, and the Fraud Section and the Office).  The Monitor shall issue a written report within one hundred eighty calendar days of commencing the initial review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Company's program for ensuring compliance with the anti-corruption laws. The Monitor should consult with the Company concerning his or her findings and

recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate.  The Monitor may also choose to share a draft of his or her reports with the Company prior to finalizing them.  The Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures and practices, but rather may focus on those areas with respect to which the Monitor wishes to make recommendations, if any, for improvement or which the Monitor otherwise concludes merit particular attention.  The Monitor shall provide the report to the Board of Directors of the Company and contemporaneously transmit copies to the Deputy Chief – FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, at 1400 New York Avenue N.W., Bond Building, Eleventh Floor, Washington, D.C. 20005.  After consultation with the Company, the Monitor may extend the time period for issuance of the initial report for a brief period of time with prior written approval of the Fraud Section and the Office.

13.    Within one hundred eighty calendar days after receiving the Monitor's initial report, the Company shall adopt and implement all recommendations in the report, unless, within sixty calendar days of receiving the report, the Company notifies in writing the Monitor and the Fraud Section and the Office of any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable.  With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred eighty calendar days of receiving the report but shall propose in writing to the Monitor and the Fraud Section and the Office an alternative policy, procedure or system designed to achieve the same objective or purpose.  As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt

in good faith to reach an agreement within forty-five calendar days after the Company serves the written notice.

14.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Fraud Section and the Office. The Fraud Section and the Office may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement.  Pending such determination, the Company shall not be required to implement any contested recommendation(s).

15.     With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred eighty calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section and the Office.

*Follow-Up Reviews*

16.     A follow-up review shall commence no later than one hundred and eighty calendar days after the issuance of the initial report (unless otherwise agreed by the Company, the Monitor and the Fraud Section and the Office).  The Monitor shall issue a written follow-up report within one hundred twenty calendar days of commencing the follow-up review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the initial review.  After consultation with the Company, the Monitor may extend the time period for issuance of the follow-up report for a brief period of time with prior written approval of the Fraud Section and the Office.

17.     Within one hundred twenty calendar days after receiving the Monitor's follow-up report, the Company shall adopt and implement all recommendations in the report, unless, within

thirty calendar days after receiving the report, the Company notifies in writing the Monitor and the Fraud Section and the Office concerning any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable.  With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred twenty calendar days of receiving the report but shall propose in writing to the Monitor and the Fraud Section and the Office an alternative policy, procedure, or system designed to achieve the same objective or purpose.  As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty calendar days after the Company serves the written notice.

18.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Fraud Section and the Office. The Fraud Section and the Office may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement.  Pending such determination, the Company shall not be required to implement any contested recommendation(s).  With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred twenty calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section and the Office.

19.     The Monitor shall undertake a second follow-up review not later than one hundred twenty calendar days after the issuance of the first follow-up report. The Monitor shall issue a second follow-up report within ninety days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16-18.  No later than

seventy-five days before the end of the Term, the Monitor shall submit to the Fraud Section and

the Office a final written report ("Certification Report"), setting forth an overview of the

Company's remediation efforts to date, including the implementation status of the Monitor's

recommendations, and an assessment of the sustainability of the Company's remediation efforts.

No later than seventy-five days before the end of the Term, the Monitor shall certify whether the

Company's compliance program, including its policies and procedures, is reasonably designed

and implemented to prevent and detect violations of the FCPA or other applicable anti-

corruption laws.

*Monitor's Discovery of Potential or Actual Misconduct*

20.     (a)       Except as set forth below in sub-paragraphs (b), (c) and (d), should the

Monitor discover during the course of his or her engagement that:

- improper payments or anything else of value may have been offered,
  promised, made, or authorized by any entity or person within the
  Company or any entity or person working, directly or indirectly, for or on
  behalf of the Company; or

- the Company may have maintained false books, records or accounts;

(collectively, "Potential Misconduct"), the Monitor shall immediately report the Potential

Misconduct to the Company's General Counsel, Chief Compliance Officer, and/or Audit

Committee for further action, unless the Potential Misconduct was already so disclosed.  The

Monitor also may report Potential Misconduct to the Fraud Section and the Office at any time,

and shall report Potential Misconduct to the Fraud Section and the Office when it requests the

information.

(b)      In some instances, the Monitor should immediately report Potential Misconduct directly to the Fraud Section and the Office and not to the Company. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Fraud Section and the Office and not to the Company, namely, where the Potential Misconduct: (1) poses a risk to public health or safety or the environment; (2) involves senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c)      If the Monitor believes that any Potential Misconduct actually occurred or may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Fraud Section and the Office.  When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Fraud Section and the Office, and, in such cases, disclosure of the Actual Misconduct to the General Counsel, Chief Compliance Officer, and/or the Audit Committee of the Company should occur as the Fraud Section, the Office, and the Monitor deem appropriate under the circumstances.

(d)      The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Fraud Section and the Office or not.  Further, if the Company or any entity or person working directly or indirectly for or on behalf of the Company withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Fraud Section and the Office and address the Company's failure to disclose the necessary information in his or her reports.

(e)     The Company nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

*Meetings During Pendency of Monitorship*

21.     The Monitor shall meet with the Fraud Section and the Office within thirty calendar days after providing each report to the Fraud Section and the Office to discuss the report, to be followed by a meeting between the Fraud Section, the Office, the Monitor, and the Company.

22.     At least annually, and more frequently if appropriate, representatives from the Company, the Fraud Section, and the Office will meet together to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Fraud Section and the Office, including with respect to the scope or costs of the monitorship.

*Contemplated Confidentiality of Monitor's Reports*

23.     The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the monitorship.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section and the Office determines in their sole discretion that disclosure would be in furtherance of the Fraud Section and the Office's discharge of their duties and responsibilities or is otherwise required by law.