

**U.S. Department of Justice**

*United States Attorney*          *Criminal Division*
*Southern District of New York*   *Fraud Section*

---

*The Silvio J. Mollo Building*         *Bond Building*
*One Saint Andrew's Plaza 950*         *1400 New York Ave, NW 11ᵗʰ Floor*
*New York, New York 10007*             *Washington, DC 20005*

February 22, 2019

Gary DiBianco, Esq.
Mitchell Ettinger, Esq.
Kara Roseen, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Ave, NW
Washington, DC 20005

Lanny Breuer, Esq.
Benjamin Haley, Esq.
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956

> Re:    *United States v. KOLORIT DIZAYN INK Limited Liability Company*

Dear Counsel:

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United

States of America, by and through the Department of Justice, Criminal Division, Fraud Section

and the Office of the United States Attorney for the Southern District of New York (collectively

the "Fraud Section and the Office"), and the Defendant, KOLORIT DIZAYN INK Limited

Liability Company (the "Defendant"), by and through its undersigned attorneys, and through its

authorized representative, pursuant to authority granted by the Defendant's shareholders and

Director, hereby submit and enter into this plea agreement (the "Agreement").  The terms and

conditions of this Agreement are as follows:

## The Defendant's Agreement

1.     Pursuant to Federal Rules of Criminal Procedure 7(b) and 11(c)(1)(C), the Defendant agrees to waive its right to grand jury indictment and its right to challenge venue in the District Court for the Southern District of New York, and to plead guilty to a one-count criminal Information charging the Defendant with one count of conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery and books and records provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, 78m(b)(2)(A), 78m(b)(5), and 78ff(a) (the "Information").  The Defendant further agrees to persist in that plea through sentencing and, as set forth below, to cooperate fully with the Fraud Section and the Office in their investigation into any and all matters relating to the conduct described in this Agreement and the Statement of Facts attached hereto as Exhibit 2 (the "Statement of Facts").

2.     The Defendant understands that, to be guilty of the offense charged in the Information, the following essential elements must be satisfied:

Count One

a.     The agreement specified in the Information, and not some other agreement or agreements, existed between at least two people to violate the anti-bribery and books and records provisions of the FCPA;

b.     the Defendant willfully joined in that agreement; and

c.     one of the conspirators committed an overt act during the period of the conspiracy in furtherance of the conspiracy.

3.     The Defendant understands and agrees that this Agreement is between the Fraud Section and the Office and the Defendant and does not bind any other division or section of the Department of Justice or any other federal, state, or local prosecuting, administrative, or regulatory authority.  Nevertheless, the Fraud Section and the Office will bring this Agreement and the nature and quality of the conduct, cooperation, and remediation of the Defendant, its direct or indirect affiliates, parent companies, subsidiaries, and joint ventures, to the attention of other prosecuting authorities or other agencies, as well as debarment authorities and Multilateral Development Banks ("MDBs"), if requested by the Defendant.

4.     The Defendant agrees that this Agreement will be executed by an authorized corporate representative.  The Defendant further agrees that a resolution duly adopted by the Defendant's shareholders in the form attached to this Agreement as Exhibit 1, authorizes the Defendant to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's shareholders, on behalf of the Defendant.

5.     The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

6.     The Fraud Section and the Office enter into this Agreement based on the individual facts and circumstances presented by this case and KOLORIT's parent company, Mobile TeleSystems PJSC ("MTS"), including:

a.     MTS is entering into a deferred prosecution agreement (the "MTS DPA") simultaneously to the Defendant entering its guilty plea;

b.      the Defendant and MTS did not receive voluntary disclosure credit pursuant to the FCPA Corporate Enforcement Policy in the Department of Justice Manual ("JM") 9-47.120, or pursuant to the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") because they did not voluntarily and timely self-disclose to the Fraud Section and the Office the conduct described in the Statement of Facts;

c.      the Defendant and MTS ultimately provided to the Fraud Section and the Office all relevant facts known to them, including information about the individuals involved in the conduct described in the Statement of Facts and fully cooperated as that term is used in the Sentencing Guidelines, including by voluntarily providing documents located outside the United States, providing summaries of MTS's internal investigation, translating foreign-language documents, and providing counsel for certain witnesses.

d.      the Defendant and MTS did not receive additional credit for cooperation and remediation pursuant to the FCPA Corporate Enforcement Policy, JM 9-47.120, because they significantly delayed production of certain relevant materials, refused to support interviews with current employees during certain periods of the investigation, and did not appropriately remediate, including by failing to take adequate disciplinary measures with respect to executives and other employees involved in the misconduct;

e.      although MTS had inadequate anti-corruption controls and an inadequate anti-corruption compliance program during the period of the conduct described in the Statement of Facts, MTS has been enhancing and has committed to continuing to enhance its compliance program and internal accounting controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to the MTS DPA;

4

f.      because MTS has not yet fully implemented or tested its compliance program, MTS has agreed to the imposition of an independent compliance monitor to reduce the risk of misconduct, including at its subsidiaries, as set forth in Attachment D to the MTS DPA;

g.      the nature and seriousness of the offense conduct, including the payment of over $420 million in bribes in violation of U.S. law to a high-level government official in Uzbekistan over nine years in furtherance of a scheme that was carried out with the involvement of high-level executives at the Defendant's parent company;

h.      the Defendant and its parent company have no prior criminal history;

i.      the Defendant and its parent company have agreed to continue to cooperate with the Fraud Section and the Office as described in Paragraph 9 below;

j.      MTS has resolved a parallel investigation by the U.S. Securities and Exchange Commission ("SEC") through a cease-and-desist proceeding, relating to the conduct described in the Statement of Facts; and

k.      the mitigating factors present in this case, including that the Uzbek government expropriated MTS's telecommunications assets in Uzbekistan, resulting in no realized pecuniary gain to MTS as a result of the misconduct described in the Statement of Facts;

l.      accordingly, after considering (a) through (k) above, the Fraud Section and the Office believe that the appropriate resolution of this case is a guilty plea by the Defendant, a $500,000 fine, forfeiture of $40,000,000, a DPA with MTS that includes a financial penalty that is approximately 25% above the low-end of MTS's Sentencing Guidelines fine range, and the imposition of an independent compliance monitor; and, consistent with JM 1-12.100 (Coordination of Corporate Resolution Penalties in Parallel and/or Joint Investigations and

Proceedings Arising from the Same Misconduct), the Fraud Section and the Office will credit the $100 million civil penalty imposed by the SEC as part of its resolution of this matter.

7.    The Defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

   a.    to plead guilty as set forth in this Agreement;

   b.    to abide by all sentencing stipulations contained in this Agreement;

   c.    to appear, through its duly appointed representative, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable U.S. and foreign laws, procedures, and regulations;

   d.    to commit no further crimes;

   e.    to be truthful at all times with the Court;

   f.    to pay the applicable fine, forfeiture, and special assessment; and

   g.    to work with its parent corporation in fulfilling the obligations of the MTS DPA.

8.    Except as may otherwise be agreed by the parties in connection with a particular transaction, the Defendant agrees that in the event that, during the term of the MTS DPA (the "Term"), the Defendant undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Defendant's consolidated operations, or to the operations of any of its subsidiaries or controlled affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision

binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.  The purchaser or successor in interest must also agree in writing that the Fraud Section's and the Office's ability to breach under this Agreement is applicable in full force to that entity.  The Defendant agrees that the failure to include these provisions in the transaction will make any such transaction null and void.  The Defendant shall provide notice to the Fraud Section and the Office at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form.  The Fraud Section and the Office shall notify the Defendant prior to such transaction (or series of transactions) if they determine that they have determined that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement.  If at any time during the Term, the Defendant engages in a transaction that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Fraud Section and the Office may deem it a breach of this Agreement pursuant to Paragraphs 22-24. Nothing herein shall restrict the Defendant from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section and the Office.

9.     The Defendant shall cooperate fully with the Fraud Section and the Office in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct related to possible corrupt payments and false books and records under investigation by the Fraud Section and the Office at any time during the Term until the later of the date upon which all investigations and prosecutions arising out of such conduct are

concluded, or the end of the Term.  At the request of the Fraud Section and the Office, the Defendant shall also cooperate fully with any other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the Multilateral Development Banks ("MDBs"), in any investigation of the Defendant, MTS or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement, the Statement of Facts, and other conduct related to possible corrupt payments or books and records violations under investigation by the Fraud Section and the Office at any time during the Term, subject to applicable law and regulations. The Defendant's cooperation pursuant to this Paragraph is subject to applicable law and regulations, including relevant data privacy and national security laws and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Defendant must provide to the Fraud Section and the Office a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Defendant bears the burden of establishing the validity of any such an assertion.  The Defendant agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

a.      The Defendant shall truthfully disclose to the Fraud Section and the Office all factual information not protected by a valid claim of attorney-client privilege, work product doctrine, or applicable foreign laws, including relevant data privacy and national security laws and regulations with respect to its activities, those of its parent company and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Defendant has

any knowledge or about which the Fraud Section and the Office may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the Fraud Section and the Office, upon request, any document, record or other tangible evidence about which the Fraud Section and the Office may inquire of the Defendant.

  b. Upon request of the Fraud Section and the Office, the Defendant shall designate knowledgeable employees, agents or attorneys to provide to the Fraud Section and the Office the information and materials described in Paragraph 9(a) above on behalf of the Defendant, to the extent permitted by applicable laws or regulations. It is further understood that the Defendant must at all times provide complete, truthful, and accurate information as requested by the Fraud Section and the Office.

  c. The Defendant shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section and the Office, present or former officers, directors, employees, agents and consultants of the Defendant. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

  d. With respect to any information, testimony, documents, records or other tangible evidence provided to the Fraud Section and the Office pursuant to this Agreement, the Defendant consents to any and all disclosures, subject to applicable law and regulations (including relevant foreign data privacy and national security laws and regulations) to other governmental authorities including United States authorities and those of a foreign government,

as well as the MDBs, of such materials as the Fraud Section and the Office, in their sole discretion, shall deem appropriate.

10.     During the term of the cooperation obligations provided for in Paragraph 9 of the Agreement, should the Defendant learn of any evidence or allegation of conduct that may constitute a violation of the FCPA anti-bribery or books and records provisions had the conduct occurred within the jurisdiction of the United States, the Defendant shall promptly report such evidence or allegation to the Fraud Section and the Office.  Thirty days prior to the end of the term of the cooperation obligations provided for in Paragraph 9 of the Agreement, the Defendant, through an appropriate senior executive, will certify to the Fraud Section and the Office that the Defendant has met its disclosure obligations pursuant to this Paragraph.  Each certification will be deemed a material statement and representation by the Defendant to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

### The United States' Agreement

11.     In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Fraud Section and the Office agree they will not file additional criminal charges against the Defendant or any of its direct or indirect affiliates, subsidiaries, or joint ventures relating to any of the conduct described in the Statement of Facts, except as set forth in the MTS DPA.  This Paragraph does not provide any protection against prosecution for any crimes, including corrupt payments made in the future by the Defendant or by any of its officers, directors, employees, agents, or consultants, whether or not disclosed by the Defendant pursuant to the terms of this Agreement.  This Agreement does not close or

preclude the investigation or prosecution of any natural persons, including any officers, directors, employees, agents, or consultants of the Defendant or its direct or indirect parent companies, affiliates, subsidiaries, or joint ventures, who may have been involved in any of the matters set forth in the Information, the Statement of Facts, or in any other matters.  The Defendant agrees that nothing in this Agreement is intended to release the Defendant from any and all of the Defendant's excise and income tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

**Factual Basis**

12.     The Defendant is pleading guilty because it is guilty of the charges contained in the Information.  The Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and the Statement of Facts are true and correct, that it is responsible for the acts of its officers, directors, employees, and agents described in the Information and the Statement of Facts, and that the Information and the Statement of Facts accurately reflect the Defendant's criminal conduct.

**The Defendant's Waiver of Rights, Including the Right to Appeal**

13.     Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn.  The Defendant expressly warrants that it has discussed these rules with its counsel and understands them.  Solely to the extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410.  Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty

plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Fraud Section and the Office have fulfilled all of their obligations under this Agreement and the Court has imposed the agreed-upon sentence, the Defendant nevertheless withdraws its guilty plea.

14.     The Defendant is satisfied that the Defendant's attorneys have rendered effective assistance.  The Defendant understands that by entering into this agreement, the Defendant surrenders certain rights as provided in this agreement.  The Defendant understands that the rights of criminal defendants include the following:

> a.     the right to plead not guilty and to persist in that plea;
>
> b.     the right to a jury trial;
>
> c.     the right to be represented by counsel – and if necessary have the court appoint counsel – at trial and at every other stage of the proceedings, including appeal;
>
> d.     the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; and
>
> e.     pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

Nonetheless, the Defendant knowingly waives the right to appeal or collaterally attack the conviction and sentence if that sentence is consistent with or below the Recommended Sentence in Paragraph 17(a) of this Plea Agreement (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever except those specifically excluded in this Paragraph, in exchange for the

concessions made by the United States in this plea agreement.  This agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).  The Defendant also knowingly waives the right to bring any collateral challenge against either the conviction, or the sentence imposed in this case.  The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a.  The Defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution related to the conduct described in the Statement of Facts or the Information, including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant violates this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of agreement, or withdrawal of plea, plus the remaining time period of the statute of limitations as of the date that this Agreement is signed.  The Fraud Section and the Office are free to take any position on appeal or any other post-judgment matter.  The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver.  Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the Defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

**Penalty**

15.      The statutory maximum sentence that the Court can impose for the offense charged in the Information is a fine of $500,000, or twice the gross gain or gross loss resulting from the offense, whichever is greatest, *see* 18 U.S.C. § 3571(c)(3) & (d); five years' probation, *see* 18 U.S.C. § 3561(c)(l); and a mandatory special assessment of $400, *see* 18 U.S.C. § 3013(a)(2)(B).  In this case, the parties agree that the gross pecuniary gain resulting from the offense is at least $40,000,000.  Therefore, pursuant to 18 U.S.C. § 3571(d), the maximum fine that may be imposed is at least $80,000,000 per offense, or in this case a total of $80,000,000.

**Sentencing Recommendation**

16.      The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory sentencing guideline range pursuant to the Sentencing Guidelines.  The Court will then determine a reasonable sentence within the statutory range after considering the advisory Sentencing Guidelines range and the factors listed in Title 18, United States Code, Section 3553(a).  The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof.   The Defendant also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 15. The Fraud Section and the Office and the Defendant agree that a faithful application of the USSG to determine the applicable fine range yields the following analysis:

        a.       The November 1, 2018 version of the Sentencing Guidelines applies.

        b.       <u>Offense Level</u>.  Based upon USSG § 2C1.1, the total offense level is 40, calculated as follows:

14

|  | | |
|---|---|---|
| (a)(2) | Base Offense Level | 12 |
| (b)(1) | Multiple bribes | +2 |
| (b)(2) | Value of unlawful payments ($40,792,848) is greater than $25,000,000 but not more than $65,000,000 | +22 |
| (b)(3) | Public official in a high-level decision-making position | +4 |
| **TOTAL** | | 40 |

c.    <u>Base Fine</u>.  Based upon USSG § 8C2.4(a)(1), the base fine is 150,000,000.

d.    <u>Culpability Score</u>.  Based upon USSG § 8C2.5, the culpability score is 4, calculated as follows:

|  | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(5) | Organization had 10 or more employees and an individual within substantial authority personnel participated in the offense | +1 |
| (g)(2) | The organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | - 2 |
| **TOTAL** | | 4 |

<u>Calculation of Fine Range</u>:

| | |
|---|---|
| Base Fine | $150,000,000 |
| Multipliers | .80 (min) / 1.60 (max) |
| Fine Range | $120,000,000 / $240,000,000 |

17.    Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Fraud Section and the Office and the Defendant agree that the following represents the appropriate disposition of the case:

a.      Disposition.  Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Fraud Section, the Office, and the Defendant agree that the appropriate disposition of this case is as set forth above, and agree to recommend jointly that the Court at a hearing to be scheduled at an agreed upon time impose a sentence requiring the Defendant to pay a criminal fine in the amount of $500,000 and $40,000,000 in criminal forfeiture and, payable in full within ten business days of such sentencing hearing ("the Recommended Sentence").    The parties agree that the Recommended Sentence is appropriate in light of the MTS DPA, which relates to the same conduct to which the Defendant is pleading guilty, and which requires MTS to pay a Total Monetary Penalty of $850,000,000 as a result of the misconduct committed by both MTS and the Defendant, as well as the factors cited in the MTS DPA.  As described in the MTS DPA, the Recommended Sentence shall be deducted from the $850,000,000 Total Monetary Penalty and shall be paid by MTS.

b.      Forfeiture:  The Defendant hereby admits the forfeiture allegation with respect to Count One of the Information and agrees to forfeit to the United States, pursuant to Title 18, United States Code, Section 981, and Title 28, United States Code, Section 2461, a sum of money equal to $40,000,000 in United States currency (the "Forfeiture Amount"), representing the amount of proceeds traceable to the violation set forth in Count One of the Information (the "Money Judgment").  The Defendant shall transfer the Forfeiture Amount plus any associated transfer fees, to be applied in full satisfaction of the Money Judgment, no later than ten business days after the Defendant's sentencing hearing, pursuant to payment instructions provided by the Fraud Section and the Office in their sole discretion.  The Defendant agrees to sign any additional documents necessary to complete forfeiture of the funds.  The Fraud Section

16

and the Office agree that the aggregate payments made by the Defendant shall be credited against the Total Monetary Penalty agreed to in the MTS DPA.  The Defendant consents to the entry of the Consent Order of Forfeiture annexed hereto as Exhibit 3 and agrees that the Consent Order of Forfeiture shall be final as to the Defendant at the time it is ordered by the Court.

c.      The Defendant shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source, other than MTS, with regard to the fine, forfeiture, or disgorgement amounts that Defendant pays pursuant to the Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in Exhibit 2.  The Defendant further acknowledges that no tax deduction may be sought in connection with the payment of any part of this $40,000,000 criminal forfeiture.  The Fraud Section and the Office believe that a disposition that includes a $500,000 fine and criminal forfeiture in the amount of $40,000,000 is appropriate based on the factors outlined in Paragraph 6 of the Agreement and those set forth in 18 U.S.C. § 3553(a).

d.      <u>Mandatory Special Assessment</u>.  The Defendant shall pay to the Clerk of Court for the United States District Court for the Southern District of New York within ten days of the time of sentencing the mandatory special assessment of $400.

18.      This Agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C).  The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement

17

contemplated.   The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

19.     In the event the Court directs the preparation of a Presentence Investigation Report, the Fraud Section and the Office will fully inform the preparer of the Presentence Investigation Report and the Court of the facts and law related to the Defendant's case.   The parties further agree to request that the Court combine the entry of the guilty plea and sentencing into one proceeding.   The parties, however, agree that in the event the Court orders that the entry of the guilty plea and sentencing hearing occur at separate proceedings, such an order will not affect the Agreement set forth herein.

## **Breach of Agreement**

20.     If, during the Term, the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraphs 9 and 10 of this Agreement; (d) commits any acts that, had they occurred within the jurisdictional reach of the FCPA, would be a violation of the FCPA; or (e) otherwise fails to completely perform or fulfill completely each of the Defendant's obligations under the Agreement, regardless of whether the Fraud Section and the Office become aware of such a breach after the term specified in the MTS DPA, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section and the Office have knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Office in the U.S. District Court for the Southern District of New York or any other appropriate venue. Determination of whether the Defendant has breached the Agreement and whether to pursue

prosecution of the Defendant shall be in the Fraud Section and the Office's sole discretion.  Any such prosecution may be premised on information provided by the Defendant.  Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year.  Thus, by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the term described in the MTS DPA plus one year.  The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement.  In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraph 9 of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section and the Office are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

21.     In the event the Fraud Section and the Office determine that the Defendant has breached this Agreement, the Fraud Section and the Office agree to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach.

Within thirty days of receipt of such notice, the Defendant shall have the opportunity to respond to the Fraud Section and the Office in writing to explain the nature and circumstances of such breach, including whether the breach is material to the Defendant's operations, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the Fraud Section and the Office shall consider in determining whether to pursue prosecution of the Defendant.

22.     In the event that the Fraud Section and the Office determine that the Defendant has breached this Agreement: (a) all statements made by or on behalf of the Defendant to the Fraud Section and the Office or to the Court, including the attached Statement of Facts, and any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section and the Office against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, will be imputed to the Defendant for the purpose of determining whether the Defendant has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section and the Office.

23.     The Defendant acknowledges that the Fraud Section and the Office have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant breaches this Agreement and this matter proceeds to judgment.  The Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

### Public Statements by the Defendant

24.     The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and the Statement of Facts.   Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution as set forth in Paragraphs 22-24 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Information or the Statement of Facts will be imputed to the Defendant for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Fraud Section and the Office.  If the Fraud Section and the Office determine that a public statement by any such person contradicts in whole or in part a statement contained in the Information or the Statement of Facts, the Fraud Section and the Office shall so notify the Defendant, and the Defendant may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification.  The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the

Information and the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or the Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

25.     The Defendant agrees that if it or any of its direct or indirect subsidiaries or controlled affiliates issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Fraud Section and the Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section and the Office and the Defendant; and (b) whether the Fraud Section and the Office have any objection to the release or statement.

## Complete Agreement

26.     This document states the full extent of the Agreement between the parties. There are no other promises or agreements, express or implied. Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

**AGREED:**
**FOR KOLORIT DIZAYN INK LIMITED LIABILITY COMPANY**

Date: ~~22nd February 2019~~           By: _____
                                            Andrey Kamensky
                                            Chief Financial Officer
                                            Mobile TeleSystems PJSC

Date: February 22 2019           By: _____
                                            Gary DiBianco
                                            Mitchell Ettinger
                                            Kara Roseen
                                            Skadden, Arps, Slate, Meagher & Flom LLP

                                            Lanny Breuer
                                            Benjamin Haley
                                            Covington & Burling LLP

                                            Counsel to Mobile TeleSystems PJSC

**FOR THE DEPARTMENT OF JUSTICE:**

                                            ROBERT A. ZINK
                                            Acting Chief, Fraud Section
                                            Criminal Division
                                            United States Department of Justice

Date: February 28, 2019           By: _____
                                            Nicola J. Mrazek
                                            Senior Litigation Counsel

                                            GEOFFREY S. BERMAN
                                            United States Attorney
                                            Southern District of New York

Date: 2/28/19           By: _____
                                            Edward Imperatore
                                            Assistant United States Attorney

                         By: _____
                                            Robert Khuzami
                                            Deputy U.S. Attorney

**EXHIBIT 1**

**<u>CERTIFICATE OF CORPORATE RESOLUTIONS</u>**

A copy of the executed Certificate of Corporate Resolutions is annexed hereto as "Exhibit 1."

| *MINUTES*<br><br>**About approval of major transactions** | **Extraordinary general meeting of participants of the Limited Liability Company " KOLORIT DIZAYN INK "** |
|---|---|
| | **Name:** LLC«KOLORIT DIZAYN INK» (hereinafter the "Company",  taxpayer identification number 206215781)<br>**Location:** 28/14 Afrasieb str., Tashkent, Republic of Uzbekistan.<br>**Type of general meeting:** extraordinary<br>**Form of the general meeting of participants:** meeting (joint presence of the Company's participants to discuss the agenda items and to make decisions on issues put to the vote).<br>**The date of the meeting:** 13 February 2019.<br>**Venue of the general meeting:** 4 Marksistskaya str., Moscow 109147, Russian Federation.<br>**Check-in time of persons entitled to participate in the general meeting:** 09 hours 45 minutes local time.<br>**Starting time of the general meeting:** 10 hours 00 minutes local time.<br>**Close-out time of persons entitled to participate in the meeting:** 10 hours 40 minutes local time.<br>**Starting time of vote counting:** 10 hours 40 minutes local time.<br>**Closing time of the meeting:** 10 hours 50 minutes local time. |
| **Chairman of the meeting:** | **A.G. Smelkov** |
| **Secretary of the Meeting:** | **S.K. Latipov** |
| **Participants:** | The Extraordinary General Meeting of the shareholders was attended by:<br><br>Limited liability company "KOLORIT DIZAYN INK" **("KolorIT")** , 99.9% of the charter capital (capital) of the Company**.**<br><br>Public Joint Stock Company "Mobile TeleSystems" **(PJSC "MTS")** owns 0,1% of the charter capital (capital) of the Company represented by Board Member - Vice President, Director of Business Unit "MTS Foreign Subsidiaries" Mr. Smelkov Andrey Gennadievich, acting under the power of attorney 0241/16 dated 10.09.2016.<br><br><br>**TOTAL:** the meeting was attended by persons owning shares in the Company's charter capital in the amount of 100% of the Company's charter capital.<br><br>A quorum for holding out of the extraordinary General meeting of participants and for consideration of the agenda items is present.<br><br>**The meeting is duly constituted.** |
|  | **Agenda:** |
| **10:00 – 10:10** | 1.   **On entering of KolorIT into Plea Agreement.** |
| **10:10 – 10:20** | 2.   **On approval of authority of MTS PJSC representative Andrey Kamenskiy is hereby authorized to appear in United States Federal District Court for the Southern District of New York.** |
|  | **IT WAS RESOLVED:** |
|  | **Item 1. On entering of KolorIT into Plea Agreement.** |

**Heard:** The Chairman of the meeting presented generally contents of the Plea Agreement with the Fraud Section and the Office to be entered into by KolorIT.

Question put to the vote:

1.1. To authorize KolorIT, the fully controlled MTS PJSC subsidiary, to enter into and be bound by the terms of the Plea Agreement with the Fraud Section and the Office substantially in the form appended hereto as Appendix 1 to this resolution (the "Plea Agreement").
1.2. To authorize MTS PJSC representative Andrey Kamenskiy is hereby authorized to execute the Plea Agreement on behalf of KOLORIT DIZAYN INK.

**Quorum for the voting is present**
**Number of votes given to every voting option:**
**For – 100% of votes;**
**Against – 0 % of votes;**
**Abstain – 0% of votes.**
**THE DECISION HAS PASSED**

**The decision:**

1.1. To authorize KolorIT, the fully controlled MTS PJSC subsidiary, to enter into and be bound by the terms of the Plea Agreement with the Fraud Section and the Office substantially in the form appended hereto as Appendix 1 to this resolution (the "Plea Agreement").
1.2. MTS PJSC representative Andrey Kamenskiy is hereby authorized to execute the Plea Agreement on behalf of KOLORIT DIZAYN INK.

**Item 2. On approval of authority of MTS PJSC representative Andrey Kamenskiy is hereby authorized to appear in United States Federal District Court for the Southern District of New York.**

**Heard:** The Chairman of the meeting proposed to authorize MTS PJSC representative Andrey Kamenskiy to appear in United States Federal District Court for the Southern District of New York to enter a plea of guilty on behalf of KOLORIT DIZAYN INK in accordance with the terms of the Plea Agreement.

Question put to the vote:

2.1.  To authorize MTS PJSC representative Andrey Kamenskiy to appear in United States Federal District Court for the Southern District of New York to enter a plea of guilty on behalf of KOLORIT DIZAYN INK in accordance with the terms of the Plea Agreement.

**Quorum for the voting is present**
**Number of votes given to every voting option:**
**For – 100% of votes;**
**Against – 0 % of votes;**
**Abstain – 0% of votes.**
**THE DECISION HAS PASSED**

**The decision:**

2.1. To authorize MTS PJSC representative Andrey Kamenskiy to appear in United States Federal District Court for the Southern District of New York to enter a plea of guilty on behalf of KOLORIT DIZAYN INK in accordance with the terms of the Plea Agreement.

**The results of the voting and decisions passed on the extraordinary shareholders' meeting were announced on the meeting. Date of these minutes: 13 February 2019.**

**Chairman of the Meeting**                    **Smelkov A.G.**

**Secretary of the Meeting**                   **Latipov S.K.**

**EXHIBIT 2**

**STATEMENT OF FACTS**

1.      The following Statement of Facts is incorporated by reference as part of the Plea

Agreement (the "Agreement") between the United States Department of Justice, Criminal

Division, Fraud Section and the United States Attorney's Office for the Southern District of New

York (collectively, the "Fraud Section and the Office") and KOLORIT DIZAYN INK Limited

Liability Company ("KOLORIT" or the "Company").  KOLORIT admits, accepts, and

acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as

set forth below.  Had this matter proceeded to trial, KOLORIT acknowledges that the Fraud

Section and the Office would have proven beyond a reasonable doubt, by admissible evidence,

the facts alleged below and set forth in the Criminal Information.

## I. Introduction

**A.      The Uzbek Regulatory Regime for Telecommunications**

2.      The Uzbek Agency for Communications and Information ("UzACI") was an

Uzbek governmental entity authorized to regulate operations and formulate state policy

regarding communications, information technology, and the use of radio spectrum in Uzbekistan.

As such, UzACI was a "department," "agency," and "instrumentality" of a foreign government,

as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States

Code, Section 78dd-1(f)(1).

1

**B.     MTS, KOLORIT, and Other Relevant Entities and Individuals**

3.      KOLORIT was an advertising company organized under the laws of Uzbekistan. In or around 2009, Uzdunrobita LLC ("Uzdunrobita") acquired KOLORIT.  KOLORIT continued to exist as a separate company after Uzdunrobita acquired KOLORIT.

4.      During the relevant time period of in or around 2009 through 2012, Mobile TeleSystems PJSC (formerly Mobile TeleSystems OJSC or "MTS") was a multinational telecommunications company headquartered and incorporated in Russia.  MTS maintained a class of securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, *see* Title 15, United States Code, Section 78*l*, and was required to file periodic reports with the U.S. Securities and Exchange Commission ("SEC") under Section 15(d) of the Securities Exchange Act, *see* Title 15, United States Code, Section 78o(d).  Accordingly, during the relevant time period, MTS was an "issuer" as that term is used in the FCPA.  MTS had subsidiaries and engaged in joint ventures in various countries in the territory of the former Soviet Union through which it conducted telecommunications business.

5.      In or around 2004, MTS began operating its mobile telecommunications business in Uzbekistan through its subsidiary Uzdunrobita, which was headquartered and organized in Uzbekistan.  From in and around 2004 to 2012, MTS held between 74% and 100% of the shares of Uzdunrobita.

6.      "Executive 1," an individual whose identity is known to the United States, was a high-ranking executive of MTS who had authority over MTS's foreign subsidiaries, including Uzdunrobita and KOLORIT, from in or around 2007 to 2013.

7.      "Executive 2," an individual whose identity is known to the United States, was a high-ranking executive of Uzdunrobita from in or around 2002 to 2012.  From in or around 2007 to 2012, Executive 2 reported to Executive 1.

8.      "Foreign Official," an individual whose identity is known to the United States, was a relative of a high-ranking Uzbek government official and an Uzbek government official, including Uzbek Deputy Minister of Foreign Affairs for Cultural Issues and Uzbekistan's Ambassador to the United Nations.  Foreign Official had influence over decisions made by UzACI.  Foreign Official was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A).  Executive 2 acted as an "agent" of Foreign Official as that term is used in U.S. law.

9.      "Shell Company A" was a company incorporated in Gibraltar that was beneficially owned by Foreign Official.

10.     "Shell Company B" was a company incorporated in Gibraltar that was beneficially owned by Foreign Official.

11.     "Associate A" and "Associate B," individuals whose identities are known to the United States, were Foreign Official's close associates.

## II. **Overview of the Corruption Scheme**

12.     From in or around 2004 to 2012, MTS, Uzdunrobita, Executive 1, and Executive 2 conspired with others to pay bribes in violation of U.S. law totaling at least $420,825,848 for the benefit of Foreign Official in order to enter and continue to operate in the Uzbek telecommunications market.  Executive 1 and certain other management and employees of MTS and affiliated entities and Executive 2 and certain management and employees of Uzdunrobita (hereinafter referred to singularly and collectively as "certain MTS management") and certain

3

management of KOLORIT understood that they had to make payments to benefit Foreign Official in order to continue to do business in Uzbekistan.  During the scheme, conspirators, including Associate A, Associate B, and certain MTS management, used U.S.-based email accounts to communicate with each other and other individuals about the scheme.  In addition, MTS and Uzdunrobita made and caused to be made numerous corrupt payments that were routed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

13.     KOLORIT joined the conspiracy in or around 2009 when MTS and Uzdunrobita acquired KOLORIT.  Executive 1, Executive 2, and certain MTS management knew that the price paid by MTS and Uzdunrobita for KOLORIT was inflated to $39.6 million in order to compensate Foreign Official in exchange for Uzdunrobita continuing to operate in Uzbekistan.

14.     In or around 2012, Uzdunrobita paid approximately $1.1 million in bribes in violation of U.S. law to entities related to Foreign Official for purported charities or sponsorships.

15.     The last corrupt payment in violation of U.S. law for the benefit of Foreign Official was made no later than in or around May 2012.  After that time, MTS, Uzdunrobita, and KOLORIT did not satisfy Foreign Official's demands for additional payments.  In retaliation, Foreign Official used her influence with the Uzbek government to expropriate Uzdunrobita.

### III.  The Corruption Scheme

**A.     Corrupt Payment of $39.6 Million Through Acquisition of KOLORIT in 2009**

16.     On or about or about July 20, 2008, Executive 1 emailed certain MTS management a memo stating that "[t]he Third Party [Foreign Official] is making a demand that [MTS] pay $50 mln . . . ." "by acquiring an asset" whose value was "overstated," which was

4

"unattractive" to MTS's "development strategy" and whose size would be "impossible to explain to the investment community."

17.    On or about September 19, 2008, Executive 1 sent certain MTS management a slide indicating a $50 million commitment to Foreign Official for various government benefits. The slide showed that, after the $30 million that had previously been paid was taken into account, the remaining balance was "$20 million."  The slide also contemplated an additional "$20 million/year" for "assistance in creating favorable conditions for the growth of the company."  Both amounts were followed by the notations, "The basis for payment and the draft agreement are being worked out."  The slide noted that "no scheme exists other than making the payment as a fee for services.  Proposing to increase the amount of the contract pertaining to [telecommunications frequencies], with delayed payments."

18.    On or about December 11, 2008, certain MTS management, including Executive 1, received a report about the possible acquisition of KOLORIT.  The report noted that KOLORIT was "connected to MTS by a long history of relations" and that it "was created by the same shareholders as Uzdunrobita before it."  Uzdunrobita had previously been majority-owned by a company beneficially owned by Foreign Official.  Noting that MTS and KOLORIT had articulated reasons for the acquisition, the report stated that "[i]n my opinion, the main reason [for the acquisition] is the interest of the founders on the Uzbekistani side and certain internal agreements.  [KOLORIT] was created and developed exclusively as a result of activities of the founders of Uzdunrobita; a clear connection is maintained today as well."  The report further noted that "the reason for the sale of KOLORIT for [KOLORIT]'s ownership is unclear," that KOLORIT did not need the sale for its development, and that "maybe, there are hidden economic factors that will not be disclosed to an external expert."

19.     On or about April 9, 2009, certain MTS management wrote Executive 1, stating that the KOLORIT "transaction is a toxic one" and that "I think that we need to get the transaction to [MTS's Investment Committee].  Let [certain MTS management] and the [Investment Committee] members share liability."

20.     On or about July 28, 2009, certain MTS management emailed an executive at a due diligence firm MTS had previously contracted with for due diligence on a different transaction that benefited Foreign Official.  The email requested the firm "initiate as quickly as possible an FCPA investigation of the following companies that are participants in [KOLORIT]."  Certain MTS management, however, did not disclose certain relevant information to the due diligence firm, including the crucial fact that certain MTS management knew that Foreign Official would benefit from the transaction.

21.     On or about August 7, 2009, certain MTS management received a memo from MTS's Department of Strategic Planning for the August 10, 2009 MTS Investment Committee meeting, recommending rejection of the KOLORIT acquisition because the acquisition was not part of MTS's "core business" and the estimate for advertising market development was "not realistic."  The memo explained, "Within [the] framework of qualitative analysis, it's hard to imagine—within [the] framework of this poor country (171st rank in GDP – per capita (PPP) and 185th rank in inflation rate), just one outdoor local advertising company could cost 40 MUSD.  This is a pure fairy tale!"  Certain internal and external valuations of KOLORIT were significantly less than the recommended purchase price.

22.     On or about August 14, 2009, certain MTS management received a report from the due diligence firm explaining that Uzbek corporate records indicated that Associate B and another individual were the shareholders of KOLORIT.  The report further noted that Foreign

Official and Associate B had various connections, but "[s]ources are unaware if [Associate B] represents the interests of [Foreign Official] at [KOLORIT]."  Although certain MTS management received the report, which stated that rumors that KOLORIT might be beneficially owned by Foreign Official were not considered credible, certain MTS management in fact knew that Foreign Official was the beneficial owner of KOLORIT.

23.     On or about September 16, 2009, Executive 1 presented the KOLORIT transaction to MTS's Board of Directors, which approved it.  The Board materials for the meeting included the inflated valuation for KOLORIT and did not disclose that Foreign Official would benefit from the transaction.

24.     On or about September 22, 2009, Uzdunrobita, through Executive 2, entered into share purchase agreements with the shareholders of KOLORIT.  On or about that same day, September 22, 2009, Uzdunrobita, through Executive 2, and the shareholders of KOLORIT executed statements of transfer and acceptance of equity interest so that MTS and Uzdunrobita could use the acquisition of KOLORIT to compensate Foreign Official in exchange for Uzdunrobita continuing to operate in Uzbekistan.  On or about that same day, September 22, 2009, Executive 2, certain MTS management, and certain KOLORIT management executed an amendment to KOLORIT's charter making MTS and Uzdunrobita KOLORIT's new owners.

25.     On or about September 22, 2009, Uzdunrobita paid the shareholders of KOLORIT a total of approximately $39,636,711 equivalent in Uzbek som.

26.     On or about September 22, 2009, an MTS subsidiary entered into a share purchase agreement with a shareholder of KOLORIT, which was executed by certain MTS management.  The shareholder of KOLORIT entered into the acquisition so that MTS and

Uzdunrobita could compensate Foreign Official in exchange for Uzdunrobita continuing to operate in Uzbekistan.

27.    On or about September 29, 2009, an MTS subsidiary transferred $17,000 to the Uzbek account of a shareholder in Uzbekistan, through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

28.    On or about November 2, 2009, Executive 1 emailed himself a presentation including an updated copy of the slide referenced in paragraph 17. The slide stated that MTS's $50 million obligation had been "Paid in full in September 2009," including "through [KOLORIT] acquisition."  The presentation also proposed "[t]o tie strictly further execution of our obligations with the partner's [*i.e.,* Foreign Official] ones."  The presentation also noted problems with changing Uzdunrobita's management, specifically Executive 2, including that there was "[n]o full support from the country's political circles to the change of this kind yet unless the Partner [*i.e.*, Foreign Official] supports" and there would be "[n]o one able to deal with the acquired [KOLORIT]." It also noted that Uzdunrobita could lose its "existing currency exchange opportunities" and "the acquired frequencies," or even face the "[r]ecall of the license in some of the regions."

## IV.  Falsification of Books and Records

29.    As a result of MTS's failure to implement effective internal accounting controls, MTS, acting through its executives and others, disguised on its books and records over $420 million in bribe payments made for the benefit of Foreign Official in exchange for MTS's and Uzdunrobita's ability to enter and continue to operate in the Uzbek telecommunications sector.

30.    In relation to the above-described payments, certain MTS management and others used a variety of non-transparent transactions with different false purported business purposes,

described above, so that the payments would be inaccurately recorded in MTS's consolidated books and records as legitimate transactions.

31.     Certain KOLORIT management, acting with certain MTS management, caused the following payments to be inaccurately recorded in MTS's consolidated books and records:

a.     Payments on or about September 22, 2009 for a total of approximately $39,636,711 equivalent in Uzbek som to the shareholders of KOLORIT.

b.     A payment on or about September 29, 2009 for approximately $17,000 to a shareholder of KOLORIT's account in Uzbekistan.

32.     MTS also created, and caused to be created, false records further to conceal these improper payments.  The bribe payments were concealed by fake contracts that were intended to create the appearance of legitimacy and were falsely described in Board materials.